*In re* V.L.T., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. V.L.T., Respondent-Appellant).

Second District   No. 2—95—1582

Opinion filed October 10, 1997.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Beth Katz, of Wheeling, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Judith E. Koehler, of Chicago, for the People.

JUSTICE INGLIS delivered the opinion of the court:

Respondent, V.L.T., was adjudicated a delinquent minor after the trial court found she had committed involuntary manslaughter (720 ILCS 5/9—3(a) (West 1994)). She was made a ward of the court and sentenced to five years' probation. On appeal, respondent argues that the trial court erred in admitting her confession into evidence because the State did not prove the confession was voluntary. For the reasons that follow, we reverse and remand.

This case arises from the death of 22-month-old K.B. on Satur-

day, January 14, 1995. Respondent, who was 10 years old, baby-sat K.B. that day. In adjudicating her a delinquent, the trial court relied, in part, on written statements obtained on Sunday, January 15, 1995, while she was in police custody. Respondent also was questioned Saturday evening, although the trial court found that she was not then in custody.

The testimony from the hearing on respondent's motion to suppress revealed that Brian Hanna, a juvenile officer from the Waukegan police department, testified that he went with Detective Kerkorian to 920 McAlister to locate respondent at about 11:45 a.m., on January 15, 1995. Inside the house, three young women told the officers that respondent was not there, but Hanna saw her hiding behind a bedroom door. Hanna entered the room and talked to respondent, who finally revealed her identity. The officers asked respondent if she wanted to come to the police station. They did not force her or put her under arrest, but they did not ask her if she would rather be interviewed at home.

At that point, Hanna and Kerkorian did not attempt to notify any adult family members that respondent had been taken for questioning. At the hearing, Hanna explained that the officers did not know the whereabouts of respondent's mother and the three women had told the officers they would try to find respondent's grandmother. The officers took respondent to a juvenile interview room without arresting or booking her. Hanna advised respondent of her rights, using a *Miranda* form for juveniles, and explained the warnings as he gave them. Respondent said she understood her rights. She initialed each written warning and signed the form. Before signing, her only question was about the meaning of "coercion," which Hanna explained. Respondent appeared normal, her speech was coherent, and she seemed to understand everything Hanna said. Hanna told her she could stop talking anytime, but respondent agreed to speak without an attorney. She never said she wanted to stop to get a lawyer or to talk to her mother or grandmother.

According to Hanna, respondent spent only about 15 or 20 minutes in the interview room. The officers did not use any promises, threats, deception, or trickery, and, as best Hanna could tell, respondent gave her statement freely.

Hanna acknowledged that respondent's mother never showed up at the police station and that her grandmother, Betty Davis, did not appear until after respondent's interview. During the interview, no one told the officers that any family members were there, and the officers did not interrupt the interview to check for themselves. From

reports, Hanna knew the police previously had had trouble locating respondent's mother, for whom an arrest warrant was outstanding. At the hearing, the trial court also took notice that it had been unable to contact respondent's mother.

Respondent's first witness was her maternal grandmother, Betty Davis. Davis lives above the restaurant where she works on 10th Street and sees respondent every day. She was also K.B.'s great aunt, and K.B.'s grandmother worked with her at the restaurant. On the evening of January 14, 1995, the unconscious K.B. was brought to the restaurant. Davis' granddaughters arrived and told her the police were at the house to take respondent in for questioning. Davis went to the house and asked the police if she could ride with respondent; they let her follow their car. Davis recounted that the police did not pick up respondent or start questioning any witnesses until about 9 p.m., when K.B. was pronounced dead at the hospital.

When Davis arrived at the station, the police were talking to numerous potential witnesses. They never sought to question her. Although Davis asked at least three times to see respondent, she did not see her until after 3 a.m., when almost everyone had left. At that time, Waukegan juvenile officer Fernando Shipley told Davis that he had received two or three statements from respondent. Shipley said he did not really believe respondent and wanted respondent to come back Sunday for more questioning. In the meantime, he turned respondent over to Davis, who took her home and returned to the restaurant. That night, Davis did not talk to respondent about what happened or about the police interview.

Davis also testified that, at some point that evening, an officer brought Davis into the interview room with respondent. Davis told her to tell the officers the truth.

On Sunday morning, one of Davis' granddaughters went to the restaurant and told her respondent was again at the police station. Davis arrived at the station about 15 minutes later and asked an officer at the desk about respondent. The officer checked and said that respondent would come out shortly, as the interview had been completed.

Respondent testified that, on Saturday night after she left the restaurant where K.B. was brought, she went to the house, where she saw several police officers. Respondent identified herself to an officer and said she had baby-sat K.B. The officer said he wanted respondent to come to the station for questioning. Although he did not place her under arrest, he did not tell her she did not have to go if she did not wish. Respondent felt she had no choice. The officers drove her to the station; Davis followed separately. This was respondent's first encounter with the police.

Respondent was taken through the back door to an interview room. She was not placed under arrest or told she had a right to remain silent, but she felt scared and did not feel free to leave the room. The three officers there questioned her but did not suggest in their own words what may have happened between respondent and K.B. None of the officers there identified themselves as a "youth officer." When respondent asked if her grandmother could come into the room with her, the officers refused. One officer told respondent to wait until they were through questioning her, after which he would talk to her grandmother. Respondent was detained from before 10 p.m. until about 3 a.m. She drank a soda and left once to use the bathroom. She had not eaten since Saturday morning.

Officer Shipley asked most of the questions. According to respondent, Shipley never informed her of any right to remain silent and told respondent that, if she did not tell him what happened with K.B., she would have to stay there the night. She told Shipley what happened. Shipley let her go and told her to wait in the hallway while he spoke with Davis. After their conversation, Davis spoke to respondent, instructing her to tell the truth. Davis left with respondent, dropped her off at the house, and went back to the restaurant.

Respondent related that she was sleeping in her bedroom on Sunday when two police detectives came to her house. Her sisters woke her up. Respondent hid behind the door out of fright. An officer found her and either asked or told her to come to the station for questioning. He was in a hurry and did not let respondent change out of her pajamas or find her own coat. Respondent felt she had no choice but to go to the station. The officers did not tell her she could refuse to go to the station or that she could be questioned at home. They did not handcuff or threaten her. Respondent had nothing to eat or drink that morning.

Detectives Hanna and Kerkorian drove respondent to the station and took her through the back door to an interview room. Neither detective told her he was a "youth officer," and neither asked for the address or phone number of a family member or whether respondent wanted a family member present. When respondent asked for her grandmother, the detectives replied that they would call Davis after respondent was done, as respondent would not be there long. They did not call Davis.

One of the officers read respondent her rights, speaking slowly and clearly and explaining each sentence. Respondent said she understood, and she initialed each warning. She understood the right to a lawyer. She signed the waiver form and never told the officer to stop because she did not understand. She never told the officers to

stop questioning her because she wanted a lawyer. A detective gave respondent a piece of paper and told her to write what had happened with K.B. The officers did not ask any questions, tell her what to write, or make any threats. Respondent was alone while she wrote out her statement. She was in the room a total of about an hour. After respondent finished writing, Davis arrived, talked with a detective outside the room, and left with respondent.

· In rebuttal, Hanna recounted that, as far as he was aware, the police took no statement from respondent on Saturday. On Sunday morning, Hanna had no record of respondent's Saturday interview. At the station, he talked to respondent for no more than 15 minutes before she wrote her statement. Hanna typed up a statement from what respondent said to the officers that morning. About 15 minutes after the statements were finished, Hanna met with Davis outside the interview room and brought her back into the room. Before this meeting, Hanna had never talked to Davis; when the girls at 920 McAlister told him they would call respondent's grandmother, Hanna did not know exactly to whom they were referring. Hanna did not know until after he left the room with respondent that Davis was at the station.

Waukegan police officer Scot Chastain testified next that, on Saturday evening, he and another officer were dispatched to 920 McAlister and to the restaurant where Davis worked. He could not remember whether he was at the restaurant or the house when, with the permission of an unidentified adult, he helped take respondent to the police station. Chastain's report recounted that he brought respondent to the station at 11:35 p.m.

Officer Shipley testified that around 9:30 or 10 p.m. Saturday, he was called to the station to oversee the investigation into K.B.'s death. Starting about 10 p.m., numerous potential witnesses, including respondent, arrived at the station. Later that night, Shipley learned that, although respondent's mother had appeared at the hospital, she did not come to the police station, apparently because there was a warrant out for her arrest. Shipley instructed some officers to call the restaurant or otherwise get in touch with the grandmother so she could come to the station to get respondent. Eventually, Shipley learned that respondent had spoken to investigators. He went to the juvenile bureau to talk to her, but he did not regard her as a suspect even after she made two unrecorded statements. Shipley did not know when respondent came to the station.

The talk lasted about 10 or 15 minutes. Respondent never said she did not want to talk to Shipley and did not ask to see her grandmother. Shipley never told her that she would stay there all

night unless she told him what happened. Shipley was aware that respondent had given inconsistent statements, so he asked her what happened. Respondent repeated one of her earlier statements, but Shipley did not write it down.

When Shipley heard that Davis was at the station, he met her and brought her to respondent. Shipley had directed other officers to call Davis; at the hearing, he recollected that respondent may have told him her grandmother worked at the restaurant and looked after her. Davis and respondent spoke briefly. Taking Davis aside, Shipley told her he did not think respondent was telling the truth, though she seemed confused rather than lying. He asked Davis if the police might pick up respondent Sunday to talk to her more. Davis said it would be no problem, and she told respondent to tell the police the truth. Well after midnight, perhaps 2 a.m., Davis left with respondent.

The parties stipulated that Detective Kerkorian would testify that on Sunday, January 15, 1995, at about noon, he and Hanna drove respondent from 920 McAlister to the police station. On arriving, they called the restaurant, telling Davis to come to the station because respondent was there for questioning. Davis arrived shortly after respondent gave her statement.

The trial court denied respondent's motion to suppress. The trial judge commented that both respondent and Davis testified "very honestly" and that there were relatively few conflicts in the evidence. The judge explained his decision as follows.

On Saturday evening, respondent was not in custody, but she was with the police for about $3^1/2$ hours, making several statements that were not recorded. Although Davis was at the station most of the night and asked to see respondent, the officers spoke to Davis only after they finished talking to respondent. Davis then told respondent to tell the officers the truth and agreed to let the police speak to respondent again the next day. Respondent was released to Davis' custody.

The next morning, the police did not attempt to get in touch with Davis, but went directly to respondent's house and hurried her directly to the police station without letting her change out of her pajamas. Upon arriving at the station, they tried to contact Davis. After respondent and the officers had been together about 20 minutes, respondent received *Miranda* warnings, signed the waiver form, and wrote a statement entirely on her own. Nobody told her what to write. The police also typed up a statement with more details, and respondent signed this as well. A few minutes after Davis arrived at the station, but after respondent finished giving her statement, the police brought Davis in to see respondent.

Respondent and Davis were kept apart on both days even though each asked to see the other on Saturday night and the police could easily have contacted Davis before taking respondent to the station on Sunday morning. The police violated section 5—6(2) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5—6(2) (West 1994)) in failing to notify Davis promptly that they were taking respondent into custody. However, this alone did not require the statements to be suppressed; rather, it was only one consideration in determining voluntariness. Other considerations militating against a finding of voluntariness were respondent's extreme youth; her limited experience with the police; and the length of the Saturday night interrogation.

Nonetheless, according to the trial court, respondent made her statements voluntarily and they could be admitted. The judge believed that respondent was motivated not by fear, misconceptions, or ignorance of her rights, but that she acted on her impulse to tell the truth and her grandmother's straightforward instruction to do so. Among the considerations reinforcing this view were the absence of threats or promises; the relative brevity of the Sunday session at the police station; the careful *Miranda* warnings and respondent's waiver of her rights; and the fact that respondent wrote the statement on her own without the police telling her what to say. The judge concluded the State had met its burden of proof. Eventually, respondent was adjudicated a delinquent and sentenced, her posttrial motion was denied, and she filed this timely appeal.

Respondent argues that the denial of her motion to suppress the statements was manifestly erroneous. Her argument centers on how law enforcement officers sought to question her and obtain statements without allowing her to communicate with her grandmother or other family members first. She observes that the trial court found that the police did not make reasonable efforts to contact Davis or other interested adults *before* they obtained her statements. According to respondent, the evidence demonstrates that law enforcement officers successfully engaged in a pattern of conduct by which they overcame the will of a 10-year-old who had no experience with the police. Respondent also emphasizes the haste with which the detectives took her to the station after she had been up much of the previous evening being questioned.

The State responds that the trial court had enough evidence to conclude that, under all the circumstances, respondent confessed voluntarily. The State notes the absence of coercion, promises, or threats, the brevity of the Sunday interview, the extensive *Miranda* warnings, and Davis' instruction to "tell the truth." According to the

State, any violation of section 5—6(2) of the Act does not require us to find the trial court erred in concluding respondent confessed because she believed it was the right thing to do.

■ On review, we must decide whether the trial court's refusal to grant the respondent's motion to suppress was manifestly erroneous. *People v. Melock*, 149 Ill. 2d 423, 448 (1992); *People v. Pico*, 287 Ill. App. 3d 607, 612-13 (1997). Our deference to the trial court's findings extends to its resolution of conflicting testimony and to its choice of competing reasonable inferences that may be drawn. *People v. Moore*, 286 Ill. App. 3d 649, 652 (1997).

With respect to voluntariness, confessions made by juveniles are generally subjected to the same scrutiny as confessions of adult defendants. *People v. Prude*, 66 Ill. 2d 470 (1977). The test is whether, under all the circumstances, the statement was made freely, without compulsion or inducement of any sort, or whether the respondent's will was overborne at the time she confessed. *People v. Brown*, 235 Ill. App. 3d 479, 489-90 (1992), relying on *Melock*, 149 Ill. 2d at 447-48.

Receiving an incriminating statement from a juvenile is a sensitive concern requiring great care, in the absence of counsel, to assure the juvenile's confession was neither coerced or suggested, nor a product of fright or despair. *People v. Knox*, 186 Ill. App. 3d 808, 812 (1989). To this end, additional factors come into play, including the time of day and the presence or absence of a parent or other adult interested in the juvenile's welfare. *Brown*, 235 Ill. App. 3d at 490. Because a juvenile is "an easy victim of the law," her confession will be deemed inadmissible if an examination of the facts reveals that it was "a confession wrung from a child by means which the law should not sanction." *Haley v. Ohio*, 332 U.S. 596, 599, 601, 92 L. Ed. 224, 228, 229, 68 S. Ct. 302, 303, 304 (1948).

Based on aspects of police conduct surrounding respondent's interview in this case, not enough care was taken to assure respondent's statement was free of compulsion or was not coerced or compelled. Instead, respondent's statement was likely coerced because the police failed to provide her with the opportunity to confer with an adult interested in her welfare and subjected her to questioning when she was deprived of sleep, food, and the proper attire.

■ We agree with the trial court that the police violated section 5—6(2) of the Act (705 ILCS 405/5—6(2) (West 1994)), by keeping respondent separate from her grandmother for most of Saturday evening and Sunday morning. We recognize that a juvenile detainee has no *per se* right to consult with her parent or guardian before questioning. *In re J.O.*, 231 Ill. App. 3d 853, 854 (1992). We also acknowledge

that a violation of section 5—6(2) alone does not require suppressing a juvenile's confession. *Pico*, 287 Ill. App. 3d at 613; *People v. Montanez*, 273 Ill. App. 3d 844, 856-57 (1995) (DiVito, J., dissenting). Therefore, our decision to reverse respondent's conviction should not be construed as founded on the violation of section 5—6(2) alone.

■ However, when considering the totality of the circumstances surrounding the confession, as is our mandate as a reviewing court (*In re J.O.*, 231 Ill. App. 3d at 854), we conclude that the trial court improperly denied respondent's motion to suppress her statement. We find that the absence of an adult interested in respondent's welfare, such as her grandmother, especially after respondent asked for her grandmother, contributed significantly to the coerciveness of the circumstances surrounding the confession. See *Knox*, 186 Ill. App. 3d at 814-15 (opportunity to confer with youth officer "crucial" in determining voluntariness). See also *Montanez*, 273 Ill. App. 3d 844; *People v. R.B.*, 232 Ill. App. 3d 583 (1992). In addition, since respondent had little prior contact with the police, there is no indication that she recognized the significance of the position of a juvenile officer or took any special comfort in one's presence. Furthermore, the record establishes that much of the police officers' conduct, particularly in rushing respondent to the station and keeping her separate from her grandmother, suggests the police attempted to coerce a confession from a very young and vulnerable suspect without consideration for her general welfare.

Other factors making up the totality of the circumstances include respondent's lengthy detention within the preceding 12-hour period, respondent's lack of any meaningful rest prior to the Sunday session, and the fact that respondent had little, if any, opportunity to eat prior to the time she wrote her confession. Unquestionably, respondent was a child of extreme youth, tired, hungry, frightened, and, most likely, humiliated to be wearing her pajamas in a police station while being questioned by adult authority figures. The coercive potential of questioning her under these circumstances is obvious.

When all of these factors are combined with the fact that respondent's grandmother, or someone truly interested in her welfare, should have been present and able to confer with her before she wrote her confession in light of her request (*In re S.D.S.*, 103 Ill. App. 3d 1008 (1982)), it is clear that the police failed to exercise the proper care to ensure that respondent's statement was not coerced. Therefore, we determine that the confession was not voluntary, and the adjudication of delinquency must be reversed. The cause is remanded for a new adjudication hearing with directions to suppress respondent's statements.

The judgment of the circuit court of Lake County is reversed and the cause is remanded with directions.

Reversed and remanded with directions.

McLAREN and HUTCHINSON, JJ., concur.