729 N.E.2d 889 (2000)
313 Ill. App.3d 422
246 Ill.Dec. 238
In re R.T., a Minor (The People of the State of Illinois, Petitioner-Appellee
v.
R.T., a Minor, Respondent-Appellant).
No. 1-98-0962.
Appellate Court of Illinois, First District, Second Division.
May 16, 2000.
*891 Richard A. Devine, State's Attorney of Cook County, Chicago (Renee Goldfarb, Susan Schierl-Sullivan and Kathryn A. Schierl, of counsel, Assistant State's Attorneys), for Appellant.
Michael J. Pelletier, Deputy Defender, Michael C. Bennett, Assistant Appellant Defender, Chicago, for Appellees.
Presiding Justice COUSINS delivered the opinion of the court:
The respondent, a minor, was charged by petition with three counts of first degree murder for the fatal shooting of a Chicago police officer. The trial court denied a motion by the State to have the respondent tried as an adult. This court affirmed. In re R.T., No. 1-96-0519, 285 Ill.App.3d 1096, 237 Ill.Dec. 328, 709 N.E.2d 314 (1996) (unpublished order under Supreme Court Rule 23).
The respondent then filed a motion to suppress, which the trial court denied after a hearing. After a bench trial the respondent was adjudicated delinquent and committed to the Department of Corrections, Juvenile Division.
The respondent now appeals, arguing that the trial court erred in denying the motion to suppress. In a supplemental brief, the respondent also argues that he must be resentenced, because the statute under which he was sentenced (705 ILCS 405/5-33 (1996)), has been found to violate the Illinois Constitution.
We affirm the judgment of delinquency but vacate the disposition and remand for resentencing.

BACKGROUND
Frank Mathews picked up R.T. at his house on the evening of September 15, 1995. Mathews was a past boyfriend of R.T.'s older sister, Kanika. Mathews showed R.T. a handgun that he had bought and then he placed it in the car. Later that night, as they were driving to the lake, they noticed that they were low on gas. R.T. suggested that they snatch a purse in order to get money for gas. R.T. saw a woman standing in the street by a black sport utility vehicle (SUV) talking to a man and another woman. The man was off-duty police officer James O'Connor. As they drove by, R.T. leaned out of the window and grabbed the woman's purse, knocking against her and breaking her ankle in the process. O'Connor got in the SUV and pursued them, flashing his lights and honking his horn. O'Connor then pulled alongside them. They could see that O'Connor had a gun and was telling them to pull over.
A few blocks later, the SUV passed them and stopped, blocking their way. O'Connor exited. Mathews put his hands up, keeping the handgun in his lap. R.T. ducked down because he thought there would be shooting. O'Connor said "Put your hands up!" Mathews shot O'Connor and started to drive away. O'Connor returned fire, hitting Mathews. The car went out of control, hit a fire hydrant and then crashed into a wall. Both O'Connor and Mathews died of their injuries. R.T. climbed out a window and ran away, but was apprehended a few blocks from the scene of the crash.
*892 R.T. was charged by petition for delinquency with first degree murder under an accountability theory and also under a felony murder theory. The State moved to have him tried as an adult, but the trial court denied this motion. We affirmed the trial court's decision on appeal. In re R.T., No. 1-96-0519, 285 Ill.App.3d 1096, 237 Ill.Dec. 328, 709 N.E.2d 314 (1996) (unpublished order under Supreme Court Rule 23). Then R.T. filed a motion to suppress incriminating statements he had made. He argued that his statements should be suppressed because the police had not allowed his mother to see him before or during questioning and because he did not have the capacity to understand Miranda warnings.
At the hearing on the motion to suppress, Chicago police sergeant James McDonnell testified as follows. Around 3 a.m. on September 16, 1995, McDonnell was on patrol in a marked police car when he picked up a call about a traffic accident nearby. As he approached the scene of the crash, he saw R.T. coming out from behind a van. When R.T. saw the police car, he retreated back behind the van but reemerged in response to McDonnell's order. McDonnell saw that R.T. had numerous cuts on his face. R.T. explained that he had been in a traffic accident. McDonnell heard something on the police radio about someone being shot at the scene of the accident. He asked R.T. if he had been shot, and R.T. said that he had not but that the gun was in the car with his brother.
McDonnell then read R.T. his rights. After each right he asked R.T. if he understood and R.T. said "yes." At that point Chicago police officer Alex Horstein drove up. McDonnell asked Horstein to stay with R.T. and told him that paramedics were coming. Then he went to investigate the crash.
Horstein testified that he was summoned to the scene of the accident by Sergeant McDonnell. He heard McDonnell read R.T. his rights and R.T. say that he understood them. Shortly after McDonnell left, the paramedics arrived and began administering first aid to R.T. While treating R.T.'s cuts, the paramedics asked him what had happened. Horstein heard R.T. say that they had been "doing some purses" to get some money and that the gun was in the car with his brother. The paramedics took R.T. to the hospital, and Horstein followed in his squad car.
Doctors treated R.T. in a curtained-off area. Horstein stood outside the curtain. Another officer came by and told Horstein that R.T. had shot and killed Officer O'Connor. Horstein then heard R.T. say "I didn't kill no policeman." Later, R.T. asked Horstein to come over to the bed and told him: "I didn't kill nobody. I didn't shoot no policeman. All we were here for, we did some robberies to get some money." Shortly thereafter another officer came and took over for Horstein.
Chicago fire department paramedic George Radka, one of the paramedics that treated R.T., testified that R.T. told him that "We have been robbing purses; they're shooting my car and hit the wall." Radka told a nearby police officer that someone might be chasing R.T. with a gun and he asked R.T. to repeat his statement to the officer. The officer listened but did not ask any questions. Radka asked the police officer to escort them to the hospital because of safety concerns.
Detective John Dawson, the detective assigned to investigate the shooting, testified that R.T.'s mother Rhenee arrived at the police station at about 7 in the morning. She was with her younger son Kashawn, Kanika, and her uncle. At about 7:45 Dawson and his partner, Detective Danz, placed Rhenee and her young son in one interview room and her daughter in another. Dawson told Rhenee that R.T. was in the hospital being treated for superficial injuries but that he would be fine and they would be transporting him to the station soon. After Rhenee and her daughter had each been questioned, she asked if she could see her son soon because Kashawn had a football game at 10.
*893 Dawson testified that, at about 10, Rhenee asked again where her son was. He told her that R.T. was just then arriving at the station but that it would take a while for him to be processed. He gave Rhenee the station phone number and introduced her to Chicago police youth officer Harry Drochner, who had been assigned to R.T.'s case.
Drochner testified that when he arrived at the hospital shortly after 7 that morning he heard Detective Moran reading R.T. his rights. R.T. indicated that he understood each right. Moran informed R.T. of the allegations against him and then asked him some questions. At 8:30 Assistant State's Attorneys (ASA) George Andrews and Debra Lawler arrived and questioned R.T. ASA Andrews read R.T. his rights, explaining each one, and informed him that since he was 14 he could be charged as an adult.
At about 10, Drochner testified, he went to the police station. R.T. had gone from the hospital slightly earlier. At the station, Drochner was introduced to Rhenee and other of R.T.'s relatives. No one had told him while he was at the hospital that R.T.'s mother was waiting at the police station. He told her that she could see R.T. as soon as processing was completed. Rhenee asked how long processing would take. She then left in order to take Kashawn to a football game. R.T. gave a handwritten statement at Andrews' request. R.T. reviewed the statement and signed it without making any corrections. Drochner then called Rhenee and told her that R.T. had been charged with robbery and murder.
ASA Andrews testified that when he arrived at the station he was told that R.T.'s mother had been there but had left in order to take her younger son to a football game. Before R.T.'s statement was taken, they allowed him to use the bathroom and gave him something to eat and drink. Andrews asked R.T. if he had been treated well and he said yes. R.T. said he was fine and did not appear to be under the influence of any medication. Andrews read the statement aloud to make sure that R.T. understood it. R.T. signed a form a the top of the statement indicating that he understood his Miranda rights and was waiving them.
Rhenee testified that the police called her around 5:15 a.m. and told her that her son and Frank Mathews had been arrested for armed robbery. She immediately woke up her other children and went with them to the station. Upon their arrival, around 6 a.m., they were taken to a little room and told that someone would come to talk to them. After they had waited for an hour, two police officers came by. She asked when she could see R.T. and was told that they would need to ask her some questions first. The officers then left. After about 45 minutes two other officers came by. Again they told Rhenee that they would need to ask her some questions before she could see her son. After another 15-minute wait, another pair of officers came in. They interviewed Rhenee after taking Kanika and Kashawn to a different room. A detective told her that R.T. was in the hospital and was well, but he would not give her specifics as to what had happened. When she asked what hospital he was at, the police simply told her that he would be brought to the station and that she could see him when he got there.
Then Rhenee's aunt and two of her uncles arrived. About 10:45 she was told that R.T. had come in but that he would need to be processed before she could see him. She asked how long this would take, because she had to take Kashawn to his football game, which was for the championship. Rhenee testified that the officer told her that she might as well go because it would be quite a while and suggested that she call back around 5 p.m.. She then left.
Dr. Edmund Kearney testified on behalf of R.T. that the minor did not have the mental capacity to properly understand the Miranda warnings. He had given R.T. a test which showed his IQ to be 72. He was of the opinion that R.T. had been *894 honest with him. On cross-examination, however, the State introduced evidence showing that R.T. had been disciplined at school more often than he had told Dr. Kearney, that his statements to Dr. Kearney about his drug and alcohol use were not consistent with what he had told others, and that, according to a 1993 IQ test, R.T.'s IQ was 92. After hearing this information, Dr. Kearney admitted he was less confident than before in his conclusion that R.T. could not understand the Miranda warnings. The State also introduced evidence that R.T. had had several previous encounters with the police and that in the course of these encounters he had been read his rights and seemed to understand them.
The trial court denied the motion to suppress, and after a bench trial, R.T. was adjudicated delinquent. The trial court committed him to the Department of Corrections, Juvenile Division.
R.T. now appeals, arguing that the trial court erred in finding that he had the capacity to understand the Miranda warnings and in finding that his statements were voluntary despite the fact that he could not meet with his mother before or during questioning. R.T. also contends that he must be resentenced because the statute under which he was sentenced, and which did not allow for probation, has been found to violate the single subject rule of the Illinois Constitution (Ill. Const.1970, art. IV, § 8(d)). He argues that he must be sentenced in accord with the prior statute, under which probation was a possible sentence.

ANALYSIS

I
Custodial interrogation of juvenile suspects is to be scrutinized with particular care in order to ensure that statements elicited are not the product of fantasy, fright or despair. People v. R.B., 232 Ill.App.3d 583, 592, 173 Ill.Dec. 905, 597 N.E.2d 879, 885 (1992). The burden rests on the State to show by a preponderance of the evidence that a confession was knowingly and intelligently given. In re J.J.C., 294 Ill.App.3d 227, 234, 228 Ill. Dec. 751, 689 N.E.2d 1172, 1178 (1998). The determination of whether the statement or confession was voluntary is made based on the totality of the circumstances. In re J.E., 285 Ill.App.3d 965, 974, 221 Ill.Dec. 249, 675 N.E.2d 156, 163 (1996). Among the factors courts consider in making this assessment are the age, intelligence and education of the accused, the duration of the questioning, whether Miranda warnings were given and whether there was any physical punishment. In re J.E., 285 Ill.App.3d at 974, 221 Ill. Dec. 249, 675 N.E.2d at 163. In the case of interrogation of juveniles, a court considers additional factors such as the time of day of the questioning and the presence of a parent or other adult interested in the juvenile's welfare. In re J.E., 285 Ill.App.3d at 974, 221 Ill.Dec. 249, 675 N.E.2d at 163. A reviewing court will not disturb a trial court's ruling on a motion to suppress a defendant's statement or confession unless that ruling is against the manifest weight of the evidence. R.B., 232 Ill.App.3d at 589, 173 Ill.Dec. 905, 597 N.E.2d at 883. We defer to the trial court's determinations of witness credibility and to its choice of competing reasonable inferences that may be drawn from the evidence. In re V.L.T., 292 Ill. App.3d 728, 736, 226 Ill.Dec. 700, 686 N.E.2d 49, 54 (1997).
R.T. first contends that his statements to police should have been suppressed because the evidence established that he did not have the mental capacity to understand the Miranda warnings. We disagree. Although R.T. presented expert testimony that he could not understand Miranda warnings, the expert's testimony was extensively impeached. It was for the trial court to determine what weight to give the psychiatric expert testimony. People v. Randle, 277 Ill.App.3d 788, 798, 214 Ill.Dec. 516, 661 N.E.2d 370, 377 (1995). The trial court's finding that R.T. did have the intelligence to understand his *895 rights when they were read to him was well supported by the evidence and, therefore, we accept that finding.
R.T. next argues that his statements should have been suppressed because his mother was not permitted to be with him when he was being questioned. In support of this contention, R.T. points to cases holding that whether a juvenile suspect is able to confer with a parent is a material factor in determining whether the suspect's statement is voluntary. People v. Montanez, 273 Ill.App.3d 844, 851-52, 210 Ill.Dec. 295, 652 N.E.2d 1271, 1276 (1995); R.B., 232 Ill.App.3d at 594, 173 Ill.Dec. 905, 597 N.E.2d at 887. In our view, the opportunity to confer with a parent is "material" in the sense that it is an important factor (People v. Brown, 182 Ill.App.3d 1046, 1055, 131 Ill.Dec. 534, 538 N.E.2d 909, 914 (1989)), but not in the sense that it is a necessary condition for the admissibility of the statement. There is no per se rule that statements obtained will be inadmissible unless juveniles are able to consult with their parents before or during questioning. Brown, 182 Ill.App.3d at 1053, 131 Ill.Dec. 534, 538 N.E.2d at 913.
The police are required by statute to notify the parents of a minor at the time he or she is taken into custody, and to tell them where the minor is being held. 705 ILCS 405/5-6(2) (West 1996). Moreover, the police should not prevent parents from conferring with their child when they have indicated an interest by their presence. In re S.D.S., 103 Ill. App.3d 1008, 1012, 59 Ill.Dec. 258, 431 N.E.2d 759, 763 (1982). Officers who know of a parent's presence should notify those questioning a juvenile. Brown, 182 Ill.App.3d at 1053, 131 Ill.Dec. 534, 538 N.E.2d at 912. But failure to notify the parents that the juvenile has been taken into custody is not sufficient per se to mandate suppression of statements. People v. Zepeda, 47 Ill.2d 23, 27, 265 N.E.2d 647, 649 (1970). And even if the police prevent a parent from seeing his or her child before or during questioning, this may not by itself render any statements involuntary. People v. Bobe, 227 Ill. App.3d 681, 702-03, 169 Ill.Dec. 814, 592 N.E.2d 301, 314-15 (1992).
Conduct by the police that effectively prevented parents from conferring with their children is, however, relevant to the voluntariness inquiry. Brown, 182 Ill.App.3d at 1055, 131 Ill.Dec. 534, 538 N.E.2d at 914; In re Lashun H., 284 Ill.App.3d 545, 553, 219 Ill.Dec. 823, 672 N.E.2d 331, 336 (1996). It suggests that, at worst, the police were trying to coerce a confession and at best that they were conducting the interrogation without due regard for the suspect's age. R.B., 232 Ill. App.3d at 595, 173 Ill.Dec. 905, 597 N.E.2d at 887. See V.L.T., 292 Ill.App.3d at 737, 226 Ill.Dec. 700, 686 N.E.2d at 55 (conduct of police in keeping suspect separate from grandmother "suggests the police attempted to coerce a confession"); Lashun H., 284 Ill.App.3d at 554-55, 219 Ill.Dec. 823, 672 N.E.2d at 337 (conduct of police in keeping suspect separate from mother indicates that the police "attempted to create a coercive environment").
In the instant case, there was conflicting testimony concerning whether the police prevented Rhenee from speaking with R.T. before he gave his statement at the police station. She indicated an interest in seeing him by her presence. In re S.D.S., 103 Ill.App.3d 1008, 1012, 59 Ill.Dec. 258, 431 N.E.2d 759, 763 (1982). The trial court found, however, that the police did not prevent Rhenee from seeing her son at the station. Since one of Rhenee's uncles could have taken Kashawn to the football game (they had two cars there), the trial court reasoned that Rhenee voluntarily left the station without seeing R.T. Rhenee did testify that the police told her that she might as well leave because she would not be allowed to see her son for a long time. However, the trial court found the testimony of the State's witnesses to be more credible. We will not disturb that finding in the instant case.
*896 Based on the totality of the circumstances, we cannot say that the trial court erred in finding that the statement at the station was voluntary. R.T. was given something to eat and drink and was not prevented from using the bathroom. He acknowledged that he had been treated well. He signed a waiver form after having his rights explained. A youth officer was present for questioning, which is a crucial point. People v. Knox, 186 Ill. App.3d 808, 814-15, 134 Ill.Dec. 564, 542 N.E.2d 910, 914 (1989). The statement was read aloud to him and he was given an opportunity to make corrections. Moreover, R.T. had had previous encounters with the police.
It is our view that the police should have let Rhenee know which hospital was treating R.T. and should have let the officers questioning R.T. at the hospital know that his mother was waiting at the station. See Brown, 182 Ill.App.3d at 1053-54, 131 Ill. Dec. 534, 538 N.E.2d at 912. In fact, the police had a statutory duty to tell Rhenee where her son was being held. The relevant statute provides:
"A law enforcement officer who takes a minor into custody without a warrant under Section 5-5 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent * * * where the minor is being held * * *." 705 ILCS 405/5-6(2) (West 1996).
The failure of the police to follow the statute and tell Rhenee where her son was being held is a factor that must be considered. However, in our view, when the factors are considered in the totality of the circumstances, in the instant case, the trial court's finding that R.T.'s statement was voluntary was not against the manifest weight of the evidence.

II
We next consider whether the Illinois Supreme Court decision in People v. Cervantes, 189 Ill.2d 80, 243 Ill.Dec. 233, 723 N.E.2d 265 (1999), mandates that the case be remanded for resentencing. In our view, remand and resentencing is mandated.
In Cervantes, the Illinois Supreme Court ruled that Public Act 88-680, popularly known as the "Safe Neighborhoods Law", violated the single subject rule of the Illinois Constitution. Ill. Const.1970, art. IV, § 8(d) ("Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject").
The "Safe Neighborhoods Law" amended the law for sentencing juvenile offenders so that probation was no longer a possible sentence for first degree murder. 705 ILCS 405/5-33 (1996). Since this law has been ruled unconstitutional, R.T. argues that we should vacate the sentence and remand for resentencing under the previous, constitutional law.
The State argues that R.T.'s sentence need not be reconsidered, because the law enacted subsequent to the invalidated "Safe Neighborhoods Law," rather than the law prior to it, should apply. The Juvenile Justice Reform Act (Pub. Act 90-590, eff. January 1, 1999) added section 5-750(2) to the Juvenile Court Act of 1987 (705 ILCS 405/5-750(2) (West 1999)). Under this new law, there also is no possibility of parole for R.T.. The State argues that section 5-750(2) may be applied without violating the constitutional prohibition of ex post facto laws (U.S. Const., art. I, § 10), citing as support Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In Dobbert, a defendant was convicted of first degree murder and then sentenced to death under a death penalty statute subsequently found to be unconstitutional. The defendant argued that his sentence should be vacated since the statute that he was sentenced on was unconstitutional. He claimed that he should have been sentenced under the previous statute. Dobbert, 432 U.S. at 292, 97 S.Ct. at 2297, 53 L.Ed.2d at 355. The Court disagreed and held that his sentence could be upheld based on the constitutional death penalty *897 statute that had been passed shortly after the prior one was invalidated.
The Court dismissed the claim on the grounds that the change in the law was procedural and, on the whole, ameliorative. Dobbert, 432 U.S. at 292, 97 S.Ct. at 2298, 53 L.Ed.2d at 355. In other words, the new law did not provide for greater punishment, but only affected the procedure under which the punishment was determined. Moreover, the court found that the defendant could not complain about the new sentencing procedure since it was overall more favorable to him than the previous scheme. Dobbert, 432 U.S. at 294, 97 S.Ct. at 2299, 53 L.Ed.2d at 357. The Court held that "[i]t is axiomatic that for a law to be ex post facto it must be more onerous than the prior law." Dobbert, 432 U.S. at 294, 97 S.Ct. at 2299, 53 L.Ed.2d at 357.
R.T. correctly notes, however, that in this case more than procedure was affected. The new law provides for a harsher range of punishment than that which was in effect at the time of the trial and is therefore "more onerous than the prior law." See Dobbert, 432 U.S. at 294, 97 S.Ct. at 2299, 53 L.Ed.2d at 357. It does not matter that the court might also have committed R.T. to a juvenile facility under the previous sentencing scheme. "[T]he ex post facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed." Lindsey v. Washington, 301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182, 1186 (1937). Commitment was the only possible disposition under the new law, while under the old law the sentencing judge had discretion to impose the lighter sentence of probation. Thus, in our view, the change in the law was substantive and not procedural. Therefore, we hold that the sentencing scheme of section 5-750(2) should not be applied retroactively. People v. Zeisler, 125 Ill.2d 42, 48-49, 125 Ill.Dec. 845, 531 N.E.2d 24, 27 (1988).
Accordingly, we affirm the finding of delinquency but vacate the disposition and remand for resentencing.
Affirmed in part and reversed in part; cause remanded.
GORDON and McBRIDE, JJ., concur.