THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRENCE GRIFFIN, Defendant-Appellant.

First District (4th Division)   No. 1—97—0315

Opinion filed January 24, 2002.

Michael J. Pelletier and Tomas G. Gonzalez, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Mary L. Boland, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Fifteen-year-old defendant Terrence Griffin was tried and convicted as an adult of first-degree murder and sentenced to 45 years' imprisonment. He appealed, arguing that his confession was involuntary and the trial court erred in denying his motion to suppress. On appeal, we found that the trial court's consideration of all of the factors under the totality of the circumstances test was incomplete. We then remanded the case for the limited purpose of a new hearing on the voluntariness of defendant's statement, specifically addressing the presence or absence of defendant's parents and any evidence of police conduct frustrating his parents' attempts to confer with defendant. *People v. Griffin*, No. 1—97—0315 (1998) (unpublished order under Supreme Court Rule 23). We also retained jurisdiction to allow review of the court's decision at the new hearing.

Following a new suppression hearing on remand, the trial court again denied defendant's motion to suppress, finding the statement voluntary. Defendant now appeals from that decision and argues that his confession was involuntary where the police (1) prevented defendant's parents from conferring with him prior to making a statement, (2) interrogated defendant in the absence of an adult concerned for his welfare, and (3) held him at the police station for over 18 hours before he confessed. For the following reasons, we reverse.

During the second suppression hearing, the parties agreed to stipulate to and include the testimony from defendant's first motion-to-suppress hearing. At that hearing in April 1994, youth officer Begeske testified that at approximately 11 p.m. or midnight on January 25, 1993, he was called to the Calumet City police station in his capacity as a youth officer. He identified himself at defendant's first interview at 3 a.m., which lasted about 30 minutes. Defendant was read his *Miranda* rights, indicated that he understood those rights, and waived them. After the interview, defendant remained in a juvenile holding cell with a bed and toilet during the day and would have been fed breakfast and lunch.

Begeske next spoke with defendant at 5:10 p.m. At that interview, Investigator Glumac and Assistant State's Attorney Danielian were also present. Defendant was again "Mirandized" before Danielian conducted the interview, which ended at approximately 8 p.m. Begeske was present when defendant made a statement, which was then reduced to writing. Danielian reviewed defendant's two-page statement with him, allowing him to make any changes before signing it.

On cross-examination, Begeske stated that defendant's parents were not at the police station when he arrived. He acknowledged that defendant's father, Mr. Willie Griffin, came to the station that day, but stated that no one advised him that defendant's mother, Mrs. Pearlie Griffin, was there. While Begeske spoke with Mr. Griffin during the day, he did not notify defendant's parents that defendant was at the station for questioning. Begeske testified that defendant never asked to speak to his parents.

Defendant testified that he was 15 years old at the time of the arrest and was a freshman in high school. He stated that Begeske was present during the 3 a.m. interview, but defendant thought that he was an investigator, not a youth officer. Defendant had previous contact with the police and other youth officers. He denied that anyone explained his rights to him and testified that he asked to speak to his parents constantly. Defendant stated that he received breakfast and lunch and was able to sleep in his cell.

Mrs. Griffin testified that, about one-half hour after the police came to her house on January 24 looking for her younger son Frank, she proceeded to the police station to see defendant. She stated that she spent at least five or six hours at the station, but the woman at the front desk would not allow her to see her son.

Danielian testified that he first interviewed defendant during the 5 p.m. interview and explained his role as an assistant State's Attorney. The conversation lasted approximately one hour before Danielian asked defendant if he would be willing to give a written statement. Defendant then read a portion of the statement to confirm that he could read English. They read through the statement together and defendant was allowed to make corrections.

The second motion-to-suppress hearing in April 2000 contained the following testimony. Officer Begeske testified that, when he arrived at the Calumet City police station around midnight on January 25, 1993, defendant's father was present. Mr. Griffin had arrived with his other son, Frank, and Chief Rhodes. Begeske spoke with Mr. Griffin and told him that defendant was a suspect in a shooting and that Frank was a witness. He stated he was present when defendant's oral and handwritten statements were made and that at no time during either interview did defendant request to see his parents. Begeske stated he was there "to make sure that everything was running smoothly *** if the defendant needed anything, you know, water, pop, *** make sure that he was taken care of." He checked on defendant in his holding cell during the day, but did not know how many times he did so.

Begeske again spoke with Mr. Griffin sometime that afternoon before defendant's confession, where they talked about the progress of

the case. However, later in his testimony, Begeske stated that he did not remember if he spoke with Mr. Griffin before or after defendant made his statement. Begeske testified that Mr. Griffin was aware that defendant was a suspect but did not indicate that he wanted to speak with him. On cross-examination, Begeske stated that he did not advise Mr. Griffin that his role as a youth officer was to protect the interests of his sons or that Mr. Griffin could be present during defendant's questioning. Begeske never told defendant that his father was in the lobby or that his father could speak with him. When he spoke with Mr. Griffin, it was through the glass window in the lobby. He did not recall seeing Mrs. Griffin at the station.

Begeske stated that he was the only youth officer at the station that day for several juvenile suspects and witnesses. Further, Begeske admitted that he was active in the investigation of this case. At 2:40 a.m., he "Mirandized" Frank and questioned him about the shooting. He then "Mirandized" and spoke with another witness, Landry Williams, about his knowledge of the crime. Begeske stated that either he or another investigator "Mirandized" defendant at the 3 a.m. interview. Begeske also testified that he was involved in and present for the "Mirandizing" of three juvenile codefendants at 6:53 a.m., 11:20 a.m., and 4:30 p.m. Begeske agreed that he left the station to investigate this crime from approximately 2 a.m. to 6 a.m. When he returned to the station, he again interviewed Frank. During that conversation, Begeske learned the location of the weapons used in the shooting, and he and another officer proceeded to codefendant Dearlo Terry's grandmother's house, where they retrieved several guns. Begeske returned to the station with the weapons and Terry and again questioned Frank.

Begeske initially denied that he and Danielian left the interview room during defendant's second interview from 5:10 p.m. until 8 p.m., but later admitted that he left defendant's presence for the statements of two other juveniles. Codefendant Terry's written statement contained Begeske's and Danielian's signatures and indicated an interview start time of 5:34 p.m. and an end time of 6:45 p.m. Terrence Hodges' written statement indicated an end time of 7:10 p.m. Begeske stated that, while he was present for the statements of Terry and Hodges, he did not conduct the interviews. Further, Begeske stated that he and the other officers confronted defendant with other witnesses' statements and may have shown defendant the recovered weapons.

Mr. Griffin testified that around midnight of January 25, 1993, he and Frank accompanied the police to the station. His wife arrived about an hour or two later and told Mr. Griffin that defendant was in

custody. Mr. Griffin stated that he and his wife repeatedly asked the uniformed woman at the front desk to see their sons but were never allowed to see them. They stayed at the station all night but left in the morning to care for their other children and returned to the station around noon. At that time, he and his wife spoke with Chief Rhodes, who said that defendant and Frank were being held and refused them access to their sons. The Griffins then left the station. On cross-examination, Mr. Griffin denied that he spoke with a youth officer that day.

Mrs. Griffin testified that she went to the police station after learning from her daughter that defendant was in custody. At the station, she and her husband asked the woman at the front desk to see their sons several times, but she refused. They left the station early in the morning and returned approximately five hours later, when they again repeatedly asked to see their sons. At one point, they spoke with Chief Rhodes in his office. Rhodes explained that defendant was involved in a shooting and that he signed a confession. Mrs. Griffin asked Rhodes to see defendant, but he told them she could not see him because he had already confessed.

Lieutenant Patrick O'Meara testified that there were no female police officers or civilians assigned to the police station front desk during the early morning of January 25, 1993. Between 11 p.m. on January 24 and 7 a.m. on January 25, only one female police officer was on duty and she was assigned to street duty.

Danielian next testified that he introduced himself when he interviewed defendant. He stated that the 5 p.m. interview lasted approximately one-half hour before defendant was taken out of the room. When defendant was brought back into the office at 7:30 p.m., Danielian asked him if he would like to make a written statement and defendant agreed. Danielian stated that defendant never asked for his parents and never indicated that he had been treated poorly. On cross-examination, Danielian stated that he interviewed all seven juvenile suspects and witnesses at the station that day. At some point, Danielian asked Begeske if someone had contacted defendant's parents and, after that conversation, Danielian understood that the Griffins knew that their sons were at the station. Danielian himself did not contact defendant's parents, nor did he direct Begeske to find them.

The trial court then made the following factual findings. The court found that defendant was arrested and brought to the Calumet City police station at approximately 11 p.m. on January 24, 1993. Defendant's parents arrived at the station shortly after midnight, with Mrs. Griffin arriving about one hour after her husband. Begeske, in his capacity as a youth officer, arrived at the station around midnight

and met with Mr. Griffin, telling him that defendant was a suspect and Frank was a witness to a shooting. Defendant was questioned twice during his time in custody, and on both occasions Begeske was present. Defendant was given his *Miranda* warnings. Except for the time that he was being questioned, defendant was fed, kept in a holding cell with a bed and allowed to use the washroom. The court noted that defendant displayed average intelligence and had been involved in the criminal justice system on prior occasions. Although defendant claimed to have asked for his parents constantly, both Begeske and Danielian testified that he did not and the court found Begeske credible in this regard. While defendant was detained for 18 hours before making a statement, the court found he was only questioned for a 30-minute period prior to that time. There was no assertion of mistreatment or coercion.

The court did not believe Mr. and Mrs. Griffin's testimony that they asked a woman at the front desk to see their sons and further stated that the evidence showed no women were working in the station during the time in question. However, the court found their testimony that Chief Rhodes refused to let them see defendant was "unequivocal and uncontroverted." The court then weighed the factors delineated in *In re G.O.*, 191 Ill. 2d 37, 727 N.E.2d 1003 (2000), and found defendant's statement voluntary.

At defendant's trial in 1996, Terrence Hodges testified that he witnessed the crime and that defendant was the shooter. While Frank testified that he could not identify defendant as the shooter, and Landry Williams testified that he did not see the actual shooting, both boys had given prior written statements to the police detailing the crime and identifying defendant as the shooter. These prior inconsistent statements, as well as defendant's statement, were all introduced into evidence. After deliberating, the jury convicted defendant of first-degree murder and the court sentenced defendant to 45 years' imprisonment.

■ For this appeal, we need only address the trial court's denial of the motion to suppress defendant's statement. When reviewing whether defendant's statement was voluntary, we accord great deference to the trial court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *In re G.O.*, 191 Ill. 2d 37, 50, 727 N.E.2d 1003, 1010 (2000). However, we apply the *de novo* standard of review when reviewing the ultimate question of whether defendant's confession was voluntary. *In re G.O.*, 191 Ill. 2d at 50, 727 N.E.2d at 1010. The State bears the burden of showing by a preponderance of the evidence that a confession was knowingly and intelligently made. *In re R.T.*, 313 Ill. App. 3d 422, 428, 729 N.E.2d 889, 894 (2000).

■ The taking of a juvenile's confession is " 'a sensitive concern.' " *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012, quoting *People v. Prude*, 66 Ill. 2d 470, 476, 363 N.E.2d 371, 373 (1977). In analyzing the voluntariness of a juvenile's confession, courts must take great care to assure that these statements were neither suggested or coerced nor a product of fright or despair. *People v. Kolakowski*, 319 Ill. App. 3d 200, 213, 745 N.E.2d 62, 74 (2001). Courts look to the totality of the circumstances and consider factors including defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including any threats or promises. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. Additional factors to consider when assessing the confession of a juvenile include the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare. *People v. Plummer*, 306 Ill. App. 3d 574, 584, 714 N.E.2d 63, 70-71 (1999). No single factor is dispositive. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. Because a minor is " 'an easy victim of the law,' " his confession will be found involuntary if the facts reveal that it was " 'a confession wrung from a child by means which the law should not sanction.' " *In re V.L.T.*, 292 Ill. App. 3d 728, 736, 686 N.E.2d 49, 54 (1997), quoting *Haley v. Ohio*, 332 U.S. 596, 599, 601, 92 L. Ed. 224, 228, 229, 68 S. Ct. 302, 303, 304 (1948).

Defendant argues that three circumstances during his detention at the police station created an overall coercive atmosphere, rendering his statement involuntary. He first contends that the police improperly prevented his parents from conferring with him prior to making a statement. The State responds that this is only one factor to consider and that the remainder of the totality of the circumstances analysis weighs in favor of admitting defendant's statement.

■ Our supreme court has found that the "concerned adult" factor, whether the juvenile had an opportunity to speak with a parent or adult interested in his welfare before or during interrogation, is an important element in determining the voluntariness of defendant's confession. *In re G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1012. While there is no *per se* rule that juveniles must be allowed to consult with their parents prior to questioning, courts have repeatedly held that police conduct which frustrates parents' attempts to confer with their child is particularly relevant and a significant factor in the totality of the circumstances analysis. *In re G.O.*, 191 Ill. 2d at 55, 727 N.E.2d at 1013; *People v. McDaniel*, 326 Ill. App. 3d 771 (2001); *People v. Golden*, 323 Ill. App. 3d 892, 900, 753 N.E.2d 475, 482 (2001); *Kolakowski*, 319 Ill. App. 3d at 214, 745 N.E.2d at 75; *In re J.J.C.*, 294 Ill. App. 3d 227,

235, 689 N.E.2d 1172, 1179 (1998); *In re Lashun H.*, 284 Ill. App. 3d 545, 553, 672 N.E.2d 331, 336 (1996). "It suggests that, at worst, the police were trying to coerce a confession and at best that they were conducting the interrogation without due regard for the suspect's age." *In re R.T.*, 313 Ill. App. 3d at 430, 729 N.E.2d at 895, citing *In re V.L.T.*, 292 Ill. App. 3d at 737, 686 N.E.2d at 55; *In re Lashun H.*, 284 Ill. App. 3d at 554-55, 672 N.E.2d at 337; *People v. R.B.*, 232 Ill. App. 3d 583, 595, 597 N.E.2d 879, 887 (1992).

■ When a juvenile's parents are present, request to see their child, and are prevented from doing so by the police, the presumption arises that the juvenile's will was overborne. *In re J.J.C.*, 294 Ill. App. 3d at 237, 689 N.E.2d at 1180. The relevant inquiry is whether the absence of a parent or other adult interested in the minor's welfare contributed to the coercive atmosphere of the interview. *People v. Smith*, 326 Ill. App. 3d 831 (2001).

■ In the present case, the police clearly frustrated the attempts of defendant's parents to see him. While the trial court did not believe the Griffins that they repeatedly asked a woman at the front desk to see defendant, it specifically found that the evidence that Chief Rhodes of the Calumet City police department refused to allow them to see their son was "unequivocal and uncontroverted." Both parents spent most of the night at the police station, leaving in the morning only to tend to younger children at home. Both returned to the station at noon and spoke with Chief Rhodes, who told the Griffins that defendant had already confessed and they could not see him. In fact, defendant did not make or sign a statement until after 5 p.m. that evening. Begeske knew Mr. Griffin was at the station and spoke with him repeatedly, but never allowed him to see defendant. The Griffins, by their presence at the police station, indicated an interest in their son and the police had an affirmative duty to stop questioning and allow his parents to confer with him. *McDaniel*, 326 Ill. App. 3d at 785; *In re L.L.*, 295 Ill. App. 3d 594, 602, 693 N.E.2d 908, 914 (1998); *In re J.E.*, 285 Ill. App. 3d 965, 974, 675 N.E.2d 156, 163 (1996). The fact that defendant never requested to confer with his parents is irrelevant and " 'blatantly disregards the interest of the parents in wishing to confer with their child before questioning.' " *McDaniel*, 326 Ill. App. 3d at 785, quoting *In re J.J.C.*, 294 Ill. App. 3d at 237, 689 N.E.2d at 1180. Therefore, we find that the police frustrated defendant's parents' attempts to see him "so that they could create an intimidating atmosphere and obtain a confession." *In re Lashun H.*, 284 Ill. App. 3d at 555, 672 N.E.2d at 338. While this factor alone does not tip the scales in favor of suppressing defendant's confession, we find it contributed significantly to a coercive atmosphere and strongly weighs against a finding that defendant's statement was voluntary.

Defendant next argues that he was denied the presence of an adult concerned for his welfare. He asserts that, although Officer Begeske was acting as a youth officer during defendant's interviews, he was actively involved in the investigation of defendant's case and gathered evidence against defendant. Begeske's actions, defendant argues, significantly contributed to the coercive atmosphere surrounding his statement. The State responds that Begeske was present during the questioning of defendant, ensured that he was treated properly, and there was no coercion.

■ While there is no requirement that a youth officer be present when a minor is questioned, it is a significant factor in the totality of the circumstances analysis. *Kolakowski*, 319 Ill. App. 3d at 213, 745 N.E.2d at 74; *In re J.J.C.*, 294 Ill. App. 3d at 237, 689 N.E.2d at 1180. Just as the absence of a parent does not *per se* make a confession involuntary, the presence of a youth officer does not *per se* make a juvenile's confession voluntary. *In re Lashun H.*, 284 Ill. App. 3d at 555, 672 N.E.2d at 338. However, in Illinois, even when youth officers are present, their role is unclear. One line of cases holds that a youth officer's role is to verify that minors' parents have been notified, ensure that the minors have been given *Miranda* rights, and see to it that minors are properly treated, that they are fed, given access to washroom facilities, and allowed to rest, and that they are not coerced in any way. *People v. Williams*, 324 Ill. App. 3d 419, 429-30, 753 N.E.2d 1089, 1098 (2001); *Kolakowski*, 319 Ill. App. 3d at 213-14, 745 N.E.2d at 74-75; *Plummer*, 306 Ill. App. 3d at 588, 714 N.E.2d at 73; *In re J.E.*, 285 Ill. App. 3d at 976-77, 675 N.E.2d at 165. Other cases find that a youth officer may not merely be present and remain silent, but must demonstrate an interest in the minors' welfare and affirmatively protect their rights. *McDaniel*, 326 Ill. App. 3d at 785; *In re L.L.*, 295 Ill. App. 3d at 603, 693 N.E.2d at 915; *In re J.J.C.*, 294 Ill. App. 3d at 237, 689 N.E.2d at 1180. These cases are fact specific and each case must be evaluated on its own particular set of circumstances. *Plummer*, 306 Ill. App. 3d at 587, 714 N.E.2d at 73.

■ In the present case, while the court made no factual findings as to Begeske's role as a youth officer, we find that Begeske failed to fulfill his duties under either of the above standards. Begeske did not remain a neutral observer but, rather, worked against defendant's interests. While an investigator's role is to interrogate witnesses and collect evidence, it is clear that the role of a youth officer is to act as a concerned adult interested in the juvenile's welfare. A youth officer cannot be adversarial or antagonistic toward the juvenile. *In re L.L.*, 295 Ill. App. 3d at 603, 693 N.E.2d at 915. Thus, these roles are inherently incompatible. Youth officers cannot act in their role as a

concerned adult while at the same time actively compiling evidence against that juvenile.

Here, Begeske admitted that, while he was acting as the only youth officer to seven juveniles including defendant, he actively investigated this case. He "Mirandized" and interrogated several witnesses, continued his investigation of the shooting outside the station, and executed a search at a codefendant's relative's house for the murder weapons. Accordingly, we hold that Begeske was not an adult concerned for defendant's welfare. Rather, he contributed to the coercive atmosphere surrounding defendant's confession. We note that, with this holding, we do not mean to suggest that youth officers must act solely in that capacity and cannot also investigate crimes. They may continue their investigations on other, unrelated matters while acting as youth officers.

While the State argues that *In re G.O.*, 191 Ill. 2d 37, 727 N.E.2d 1003 (2000), and *People v. Morgan*, 197 Ill. 2d 404, 758 N.E.2d 813 (2001), dictate that defendant's confession was voluntary, both cases are distinguishable from the case before us. In *In re G.O.* and *Morgan*, the presence of a concerned adult was but one factor in the totality of the circumstances analysis. In both cases, our supreme court found defendants' statements voluntary, based in part on the fact that the police did not prevent the juveniles' parents or other concerned adult from speaking with the minors. *People v. Morgan*, 197 Ill. 2d 404, 440-41, 758 N.E.2d 813, 834-35 (2001); *In re G.O.*, 191 Ill. 2d at 55-56, 727 N.E.2d at 1013. In *In re G.O.*, defendant's mother was initially reluctant to go to the station, finally arriving after defendant confessed, and was then brought to see defendant. *In re G.O.*, 191 Ill. 2d at 50-56, 727 N.E.2d at 1010-13. In *Morgan*, the police reasonably believed that the victims, defendant's grandparents, were his legal guardians and, therefore, did not contact defendant's mother in Virginia for several hours. *Morgan*, 197 Ill. 2d at 440-41, 758 N.E.2d at 834.

Here, however, both of defendant's parents remained at the police station for several hours and repeatedly asked to see defendant. The trial court specifically held that the chief of police frustrated defendant's parents from conferring with him prior to or during interrogation. Further, neither *In re G.O.* nor *Morgan* involved a youth officer who actively investigated defendant's case and compiled evidence against him while serving as a youth officer. Therefore, *In re G.O.* and *Morgan* are distinguishable from the case at bar.

Instead, the present case is similar to *McDaniel*, 326 Ill. App. 3d 771. *McDaniel* involved a 14-year-old minor with little prior police contact charged as an adult with first-degree murder and aggravated

battery with a firearm. The appellate court found that, despite defendant's mother's numerous requests to see her son, the police frustrated her attempts to confer with defendant prior to his interrogation. Moreover, while a youth officer was present during the questioning of defendant, the court noted that the youth officer showed no interest in protecting defendant's rights. Based mainly on these two factors, the court held that defendant's statement was involuntary. The facts of the present case are more egregious than those in *McDaniel* and warrant the suppression of defendant's confession.

■ Lastly, defendant contends that his 18-hour detention before he made a statement also contributed to the coercive atmosphere surrounding his confession. As stated above, the length of questioning and duration of the detention, as well as the time of day the juvenile was questioned, are factors in the totality of the circumstances analysis, but are not dispositive of the issue of voluntariness. *In re G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012. The facts reveal that defendant was taken into custody about 11 p.m., held in a juvenile holding cell for 18 hours, and questioned for 30 minutes at 3 a.m. before confessing sometime after 5 p.m. While this conduct is not condoned, this factor alone does not render defendant's confession involuntary. However, it did contribute to the coercive nature of defendant's confession and weighs against its admission.

■ We conclude that the totality of the circumstances dictates that defendant's confession was involuntary. Weighing in favor of the admission of his statement are that he was of average intelligence and had two previous contacts with the police. He was "Mirandized" before questioning and responded that he understood those rights. There was no physical abuse and defendant was allowed food, a place to rest, and access to washroom facilities.

However, the other factors weigh against admission. Defendant was just a week past his fifteenth birthday at the time of his arrest. Further, the chief of police frustrated the attempts of his parents to confer with him either before or during questioning. Significantly, defendant was also deprived of any concerned adult because his youth officer actively investigated and gathered evidence against defendant. Defendant was taken into custody at 11 p.m., interrogated during the early morning hours and the next day before making a statement 18 hours later. Thus, we find that the coercive atmosphere created by these circumstances rendered defendant's statement involuntary and defendant's motion to suppress his statement should have been granted.

For the foregoing reasons, we reverse the trial court's denial of

defendant's motion to suppress, remand for a new trial, and vacate defendant's conviction and sentence.

Reversed and remanded; conviction and sentence vacated.

HOFFMAN, P.J., and HARTMAN, J., concur.