(No. 87229.— )

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ARACELI CERVANTES, Appellee.

*Opinion filed December 2, 1999.—Rehearing denied January 31, 2000.*

James E. Ryan, Attorney General, of Springfield, and
David R. Akemann, State's Attorney, of St. Charles (Joel

D. Bertocchi, Solicitor General, and William L. Browers and Jay Paul Hoffman, Assistant Attorneys General, of Chicago, of counsel), for the People.

G. Joseph Weller, Deputy Defender, and Patrick M. Carmody, Assistant Defender, both of Elgin, and Martin J. Ryan, Assistant Defender, of Springfield, all of the Office of the State Appellate Defender, for appellee.

Diane Ford, General Counsel to the Governor, and Mark R. Warnsing, Assistant General Counsel, both of Springfield, for *amicus curiae* Governor George H. Ryan.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon and Jane Elinor Notz, of counsel), for *amicus curiae* City of Chicago.

Renee Goldfarb, Mary L. Boland and Alan J. Spellberg, all of Chicago, for *amicus curiae* Cook County State's Attorney Richard A. Devine.

JUSTICE McMORROW delivered the opinion of the court:

The sole issue presented in this appeal is whether the General Assembly violated the single subject clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 8(d)) when it enacted Public Act 88—680 (Pub. Act 88—680, eff. January 1, 1995). The circuit court held that Public Act 88—680, also known as the "Safe Neighborhoods Law," did not comply with the single subject rule. The State appealed directly to this court. 134 Ill. 2d R. 302(a). For the reasons that follow, we affirm the judgment of the circuit court and hold that Public Act 88—680 violates the single subject requirement.

## BACKGROUND

On February 25, 1998, defendant, Araceli Cervantes,

was charged in a four-count indictment. Count I charged defendant with the offense of gunrunning, in violation of section 24—3A(a) of the Criminal Code of 1961 (720 ILCS 5/24—3A(a) (West 1998)). The other three counts of the indictment, which are not at issue in this appeal, charged defendant with the unlawful sale of firearms, in violation of section 24—3(g) of the Criminal Code (720 ILCS 5/24—3(g) (West 1998)). Defendant filed a motion to dismiss count I of the indictment, on the basis that Public Act 88—680, which created the offense of gunrunning, violated the single subject rule of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)). The circuit court granted defendant's motion to dismiss, relying upon the appellate court decision in *People v. Dainty*, 299 Ill. App. 3d 235 (1998), which held that Public Act 88—680 violated the single subject requirement. The State appealed directly to this court. 134 Ill. 2d R. 302(a).

## ANALYSIS

The single subject clause of the Illinois Constitution provides, in relevant part: "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, § 8(d). As we have previously explained, the single subject rule regulates the process by which legislation is enacted. *People v. Reedy*, 186 Ill. 2d 1, 8 (1999); *Johnson v. Edgar*, 176 Ill. 2d 499, 502 (1997). Specifically, the single subject clause operates to prevent the passage of legislation that, standing alone, may not muster the votes necessary for enactment. *Reedy*, 186 Ill. 2d at 13; *Johnson*, 176 Ill. 2d at 514; *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 258 (1992); *Fuehrmeyer v. City of Chicago*, 57 Ill. 2d 193, 201 (1974). The single subject requirement also facilitates the enactment of bills through an orderly and informed legislative process, in that "[b]y limiting each bill to a single subject, each legislator can better

understand and more intelligently debate the issues presented by a bill." *Reedy*, 186 Ill. 2d at 14; see also *Johnson*, 176 Ill. 2d at 514-15. The single subject requirement, therefore, "ensures that the legislature addresses the difficult decisions it faces directly and subject to public scrutiny, rather than passing unpopular measures on the backs of popular ones." *Johnson*, 176 Ill. 2d at 515; see also *Reedy*, 186 Ill. 2d at 14.

In determining whether a particular enactment violates the single subject requirement, the term "subject" is to be liberally construed in favor of upholding the legislation, and the subject may be as comprehensive as the legislature chooses. *People v. Wooters*, 188 Ill. 2d 500, 511 (1999); *Arangold v. Zehnder*, 187 Ill. 2d 341, 351-52 (1999); *Johnson*, 176 Ill. 2d at 515; *People v. Dunigan*, 165 Ill. 2d 235, 255 (1995); *People ex rel. Ogilvie v. Lewis*, 49 Ill. 2d 476, 487 (1971). Nevertheless, a legislative act violates the single subject rule when the General Assembly "includes within one bill unrelated provisions that by no fair interpretation have any legitimate relation to one another." *Reedy*, 186 Ill. 2d at 9; see also *Wooters*, 188 Ill. 2d at 511; *Arangold*, 187 Ill. 2d at 352; *Johnson*, 176 Ill. 2d at 515; *Dunigan*, 165 Ill. 2d at 255. Therefore, in order to satisfy the single subject requirement, the matters included within the enactment must have a "natural and logical connection" to a single subject. *Arangold*, 187 Ill. 2d at 352; *Reedy*, 186 Ill. 2d at 9; *Johnson*, 176 Ill. 2d at 515.

The State initially maintains that defendant's single subject challenge to Public Act 88—680 should be regarded as untimely. The State premises this contention upon the application of the so-called "codification rule," which precludes a defendant from challenging the constitutionality of a legislative act on single subject grounds once it has become codified. See *State v. Mabry*, 460 N.W.2d 472, 475 (Iowa 1990). Although we have

recently and unequivocally rejected this precise argument in *Wooters* (188 Ill. 2d at 519-20) and *Reedy* (186 Ill. 2d at 13-14), the State entreats us to reconsider our holdings in those cases. For the reasons stated in *Reedy*, 186 Ill. 2d at 13-14, we adhere to our previous rejection of the codification rule, and decline to address this issue anew.

We next turn to the State's assertion that Public Act 88—680 comports with the single subject rule because each of its various sections relates to the single subject of "neighborhood safety." We note that our appellate court has not been uniform on the issue of whether Public Act 88—680 violates the single subject requirement. The First and Fourth Districts have found the Act constitutional (see *People v. Wiggins*, 298 Ill. App. 3d 766 (1st Dist. 1998); *People v. Boatman*, 303 Ill. App. 3d 589 (4th Dist. 1999)), whereas the Second and Third Districts have found that Public Act 88—680 violates the single subject rule. See *People v. Edwards*, 304 Ill. App. 3d 250 (2d Dist. 1999); *People v. Williams*, 302 Ill. App. 3d 975 (2d Dist. 1999); *People v. Dainty*, 299 Ill. App. 3d 235 (3d Dist. 1998).

We begin our analysis with a review of the history and content of Public Act 88—680. Public Act 88—680 was originally introduced on January 12, 1994, as Senate Bill 1153, and was entitled "A Bill for an Act to amend the Criminal Code of 1961." In its original form, the bill was designed to amend sections of the Criminal Code to require a trial court to impose a sentence of community service on any person convicted of, or placed on supervision for, assault, criminal damage to property, certain weapons violations, mob action, or disorderly conduct. On April 13, 1994, this bill was amended by the Senate to provide that mandatory community service for the enumerated crimes would apply only in instances where incarceration was not imposed. On April 14, 1994, the

Senate passed the bill as amended, and sent the bill to the House of Representatives.

By May 24, 1994, Senate Bill 1153 had been read twice in the House. Several months later, in November 1994, members of the House offered and withdrew 12 amendments to this bill. A thirteenth amendment, sponsored by Representative Dart, was added to the bill on November 15, 1995. Amendment number 13 deleted every word of Senate Bill 1153 as passed by the Senate, with the exception of the enabling clause, and replaced the text with a bill entitled, "An Act to Create a Safe Neighborhoods Law." In its revised form, Senate Bill 1153 amended 83 Illinois statutes, created 22 new statutes, and repealed one statute. On November 15, 1994, the bill, as amended, had its second and third readings and was passed by the House.

Upon the return of the amended bill to the Senate on November 30, 1994, the Senate voted to nonconcur in House amendment 13. Because the Senate and the House could not agree on which provisions of amendment 13 should stand, a conference committee was formed. The next day, December 1, 1994, a report issued by the conference committee on Senate Bill 1153 recommended that the entire text of the bill (as revised by House amendment 13) be deleted and replaced with another version of "the Safe Neighborhoods Law." Senator Dudycz, who reported the conference committee's recommendations to the Senate, stated that Senate Bill 1153 had grown into a "one-hundred-and-fifty-seven page document," and was now comprised of "three components." 88th Ill. Gen. Assem., Senate Proceedings, December 1, 1994, at 44-45 (statements of Senator Dudycz). The first component consisted of the contents of House Bill 381, which toughened and expanded various criminal laws, including child pornography, juvenile pimping, prostitution, criminal use of firearms, and fraud in the Women, Infants

and Children (WIC) program. The second component, which according to Senator Dudycz resulted from "input from the Governor's office," established privately operated juvenile secure residential facilities to house delinquent minors. The bill's final component was described by Senator Dudycz as "fourteen proposals from the Mayor's Illinois Safe Neighborhoods bill." 88th Ill. Gen. Assem., Senate Proceedings, December 1, 1994, at 46 (statements of Senator Dudycz). The Senate approved the conference committee's report that same day.

Senate Bill 1153 was immediately sent to the House, where Representative Dart explained the bill's provisions as follows: "The long and short of this Bill is that it has provisions which are attempting to go after the main problems we're having on our streets these days. It's going after gangs, drugs and guns, namely." 88th Ill. Gen. Assem., House Proceedings, December 1, 1994, at 69 (statements of Representative Dart). That same day, the House approved the conference committee's recommendation and passed Senate Bill 1153 in its final form. Senate Bill 1153 was signed by the Governor on December 15, 1994, and became effective January 1, 1995.

The final version of the bill amended 55 Illinois statutes, created 10 new statutes, and repealed one statute. Article 5 of Public Act 88—680 amended the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1—1 et seq. (West 1992)) to expand the types of offenses for which a minor can be tried as an adult, to mandate imprisonment for juveniles adjudicated delinquent for first degree murder, and to lengthen the time period that the State may continue adjudicatory hearings.

Article 15, entitled "Gangs," amended the Criminal Code (720 ILCS 5/1—1 et seq. (West 1992)) to increase the sentence for intimidation, communicating with jurors and witnesses, and harassment of jurors and witnesses.

Article 15 also amended the Unified Code of Corrections (Unified Code) (730 ILCS 5/1—1—1 *et seq.* (West 1992)) to permit extended-term sentences for defendants who commit felonies in furtherance of the activities of an "organized gang," and to require that defendants sentenced to probation or conditional discharge or placed on supervision for such offenses perform community service.

Article 20, entitled "Alcohol Abuse," amended the Illinois Vehicle Code (625 ILCS 5/1—100 *et seq.* (West 1992)) to provide for both minimum and enhanced penalties for driving with a revoked or suspended license, and to increase the penalty for aggravated DUI.

Article 25, entitled "Drug Abuse," amended both the Cannabis Control Act (720 ILCS 550/1 *et seq.* (West 1992)) and the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 1992)) to specify a 24-month period of probation for first-time offenders, establish certain conditions for probation, and allow for the use, during the aggravation portion of a sentencing hearing, of an offender's prior drug convictions that were discharged or dismissed.

Article 30, entitled "Firearms," amended the Criminal Code to create the offense of gunrunning, to increase the penalty for defacing identification marks on firearms, to prevent a court from ordering the transfer of a confiscated weapon to a private individual other than its rightful owner, and to provide that possession of a firearm in violation of conditions of bail is a felony. Article 30 also amended the Code of Criminal Procedure of 1963 (725 ILCS 5/100—1 (West 1992)) to provide for the surrender of firearms by a person released on bail prior to conviction for certain offenses.

The remaining articles of Public Act 88—680 were untitled. Article 35 amended the Criminal Code to increase the sentencing ranges for attempted first degree

murder, aggravated battery with a firearm, and aggravated discharge of a firearm. Article 35 also amended the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq.* (West 1994)) to allow State's Attorneys and the Prisoner Review Board to provide victims and witnesses of violent crimes with more information and to expand the rights of victims in such cases to present an impact statement. In addition, article 35 amended the Unified Code to require the Department of Corrections to provide notice of the escape or release of certain offenders.

Article 40 amended the Criminal Code to increase the penalty for compelling the membership of persons in an organization.

Article 45 created the Secure Residential Youth Care Facility Licensing Act as part of the Unified Code (730 ILCS 175/45—1 *et seq.* (West 1994)), which required the Department of Corrections to establish a licensing system for secure residential youth facilities. In turn, article 45 also amended the State Finance Act (30 ILCS 105/1 *et seq.* (West 1994)) by adding the Secure Residential Youth Care Facility Fund to the list of special funds. Article 45 additionally amended the Unified Code to establish an interagency review committee to determine whether a minor placed with the Department of Children and Family Services should be committed to the Department of Corrections, and also amended the Private Correctional Facility Moratorium Act (730 ILCS 140/1 *et seq.* (West 1994)) to create an exemption from the general prohibition against privately run correctional facilities for juvenile residential facilities.

Article 50 of Public Act 88—680 amended the WIC Vendor Management Act (WIC Act) (410 ILCS 255/1 *et seq.* (West 1992)), by expanding the types of business entities subject to civil monetary penalties for violations of either the WIC Act or WIC program regulations, delet-

ing language requiring that training fees or penalty money received by the Department of Public Health be used to administer the Act, deleting language allowing the Department of Public Health to invest penalty money, and requiring the Department of Public Health to promulgate rules concerning administrative appeals from sanctions imposed upon the new types of business entities subject to civil monetary sanctions under the Act.

Article 50 also amended the Firearm Owners Identification Card Act (FOID Act) (430 ILCS 65/0.01 *et seq.* (West 1992)) to require that each FOID card applicant certify that he or she is not an illegal alien and to provide the State Police the authority to deny an application for a FOID card or to revoke and seize a FOID card if it finds that the person is an illegal alien, to require that FOID card expiration dates be conspicuously displayed on the card's face, and to increase the penalties for possession of a firearm without a valid FOID card.

Article 50 additionally amended the Juvenile Court Act to require that, in juvenile cases where the minor is not sent to prison and where the court finds that the delinquent conduct was gang related or involved an illegal use of a firearm, the offender serve 30 to 120 hours of community service as a condition of supervision. Article 50 also amended the Criminal Code to expand the scope of the offenses of prostitution, solicitation of a sexual act, pandering, pimping, juvenile pimping, child pornography, and exploitation of a child.

Additionally, article 50 amended the Criminal Code by creating the offense of WIC benefits fraud (720 ILCS 5/17B—1 *et seq.* (West 1994)), and establishing a range of criminal penalties as well as required forfeiture of items of value either obtained through WIC fraud or used to commit WIC fraud. Article 50 also increased the penalties for the unlawful use of weapons, the unlawful sale of firearms, the unlawful possession of firearms, and armed

violence; re-categorized weapons used in committing armed violence; and included a new "Category III" weapon in the definition of a dangerous weapon. Furthermore, article 50 amended the Wrongs to Children Act (720 ILCS 150/0.01 *et seq.* (West 1994)) to expand the scope of the Act pertaining to the sexual exploitation of a child. Article 50 also amended the Unified Code to make a Class 3 felony violation of the FOID Act a nonprobationable offense and to impose minimum penalties for DUI on a revoked, suspended or restricted license that resulted from a previous DUI offense.

Our review of the history and content of Public Act 88—680 reveals that, no matter how liberally the single subject requirement is construed, this Act was passed in violation of the single subject clause of the Illinois Constitution. It is evident from our examination of Public Act 88—680's history that the stated purpose of various provisions of the Act was to address "the main problems we're having on our streets these days," specifically in relation to "gangs, drugs and guns." 88th Ill. Gen. Assem., House Proceedings, December 1, 1994, at 69 (statements of Representative Dart). The State echoes this declaration and contends that all of the provisions contained within Public Act 88—680 relate to the subject of neighborhood safety "by creating new crimes, discouraging crime through enhanced penalties, and providing for better enforcement of the laws." We disagree. We discern no natural and logical connection between the subject of enhancing neighborhood safety and Public Act 88—680's amendments to the civil WIC Vendor Management Act, or the creation of the Secure Residential Youth Care Facilities Licensing Act. See *Williams*, 302 Ill. App. 3d at 979; *Dainty*, 299 Ill. App. 3d at 242.

The WIC Vendor Management Act (410 ILCS 255/1 *et seq.* (West 1996)) is contained within the public health chapter of the Illinois Compiled Statutes. The purpose of

the WIC Vendor Management Act "is to establish the statutory authority for the authorization, limitation, education and compliance review of WIC retail vendors by the Department of Human Services, and to enable the Department to carry out its responsibilities for fiscal management and accountability for the food delivery system under its jurisdiction." 410 ILCS 255/2 (West 1996). To this end, the Act provides that the Department shall establish criteria and procedures for application to become a WIC retail food vendor (410 ILCS 255/4 (West 1996)), as well as criteria for the authorization, education, geographic distribution and number of WIC vendors (410 ILCS 255/5 (West 1996)). The WIC Vendor Management Act also authorizes the Department to monitor the compliance of WIC vendors with federal and state laws and rules governing the WIC program, and to impose monetary penalties and sanctions for program violations. 410 ILCS 255/6 (West 1996).

Attempting to explain the natural and logical connection between amendments made by Public Act 88—680 to the WIC Vendor Management Act and the subject of neighborhood safety, the State principally relies upon the appellate court's decision in *People v. Wiggins*, 298 Ill. App. 3d 766, 770 (1st Dist. 1998) and contends that Public Act 88—680 "amended the WIC Vendor Management Act to criminalize fraud and to create forfeiture actions for the commission of fraud." The State further elaborates that the "WIC fraud" provisions "also provide a tool against neighborhood crime, intimidation, and poverty," by "attempt[ing] to curtail the trade in benefits which are supposed to help underprivileged families survive."

Although the State is correct that Public Act 88—680 amended the Criminal Code by creating the criminal offense of WIC benefits fraud and establishing a range of penalties and forfeitures for such offenses, the State, like

the appellate court in *Wiggins*, incorrectly melds the creation of these criminal offenses with the amendments made by Public Act 88—680 to the WIC Vendor Management Act. Section 6 of the WIC Vendor Management Act was amended by Public Act 88—680 to expand the types of business entities that are subject to civil monetary penalties for violations of either the WIC Act or WIC program regulations. 410 ILCS 255/6 (West 1996). Section 7 of the WIC Vendor Management Act was amended to repeal the authority of the Department of Public Health to invest training fees or penalty money, and to delete restrictions which formerly required that money received in training fees and penalties by the Department of Public Health may only be used to administer the Act. 410 ILCS 255/7 (West 1996). Finally, section 8 of the WIC Vendor Management Act was amended to expand the obligations of the Department of Public Health to promulgate rules concerning administrative appeals from civil sanctions imposed upon the new types of business entities subject to sanctions under the WIC Act or program rules. 410 ILCS 255/8 (West 1996).

Contrary to the State's assertions, none of the amendments to the WIC Vendor Management Act mention abuse of WIC benefits, criminal WIC fraud, criminal penalties, or forfeiture. The plain language of the WIC Vendor Management Act indicates that the provisions bestow authority upon the Department to operate the WIC program and govern the day-to-day operations of WIC retail vendors.[1] We cannot discern, and the State has been unable to establish, how any of these provisions

---

[1]For example, in the only reported case decided under the WIC Vendor Management Act, *Crystal Food & Liquor, Inc. v. Howard Consultants, Inc.*, 276 Ill. App. 3d 504, 507 (1995), the court upheld sanctions imposed by the Department where the vendor had submitted and received payment for WIC food vouchers in excess of the amount of the items' purchase price.

bear a natural and logical connection to neighborhood safety. Although we are mindful that, in enacting a bill, the legislature may provide the means necessary to accomplish the legislative purpose (*Arangold*, 187 Ill. 2d at 8; *Cutinello v. Whitley*, 161 Ill. 2d 409, 424 (1994)), we cannot ascertain how the repeal of the Department's authority to use and invest WIC penalties and training fees are germane to furthering the safety of neighborhoods. A legislative enactment violates the single subject requirement "when the statute, on its face, clearly embraces more than one subject." *Dunigan*, 165 Ill. 2d at 254-55; see also *Fuehrmeyer*, 57 Ill. 2d at 202.

Furthermore, even looking beyond the face of the statute, we still do not find a connection or relation between the WIC Vendor Management Act and the subject of neighborhood safety. During oral argument, the State's representative was asked to explain this connection, and he replied as follows: "It relates to the WIC fraud cases, which relate to safety *** the fact that they no longer have to invest those sums in one particular area could possibly help—they could be invested in some other area to put playgrounds in or money back on the street." We find the State's contention unpersuasive, particularly in light of the fact that a review of Public Act 88—680, the legislative debates, the journals of both the Senate and the House and the legislative digest reveal no reference to any such intent. To the contrary, no debate took place in either the House or the Senate concerning the WIC Vendor Management Act amendments.

We therefore conclude that there is a lack of a natural and logical connection between the provisions of Public Act 88—680 which amend the WIC Vendor Management Act and the subject of neighborhood safety. See *Williams*, 302 Ill. App. 3d at 979; *Dainty*, 299 Ill. App. 3d at 242.

We additionally find that Public Act 88—680 violates

the single subject requirement by amending the Uniform Code to create the Secure Residential Youth Care Facility Licensing Act (Licensing Act). Once again relying upon the appellate court's decision in *Wiggins*, the State contends that the provisions of Public Act 88—680 which allow private ownership and operation of secure residential youth facilities under the regulation of the Department of Corrections have a connection to neighborhood safety because they provide "the financial and procedural means to implement the penalties designed to curb the spate of juvenile crime plaguing our state and society." The State further elaborates that "young offenders who are beyond the help of DCFS will be secured from the neighborhoods that their actions were harming. At the same time, the residential facilities will provide a place away from the general Department of Corrections facilities in which the juveniles can hopefully get the attention and care they need to be rehabilitated *** [and] [c]learly, to the extent the juveniles are rehabilitated, future neighborhood crime is curtailed."

The State's contentions are belied by a review of the provisions of the Licensing Act. This Act contains specific instructions for applying for a secure residential youth care facility license (730 ILCS 175/45—20, 45—40 (West 1996)); provides that any license applicant must undergo a criminal background check (730 ILCS 175/45—25 (West 1996)) and specifies that an applicant is ineligible for a license if convicted of one of several enumerated offenses (730 ILCS 175/45—30 (West 1996)); lists reasons for license revocation (730 ILCS 175/45—70 (West 1996)); and provides the procedure for revocation (730 ILCS 175/45—80, 45—85, 45—90 (West 1996)) and the remedies available to a licensee once a license is revoked (730 ILCS 175/45—120 (West 1996)).

Contrary to the assertions of the State, none of the provisions of the Licensing Act refer to the rehabilitation

of juvenile offenders or implementation of increased juvenile penalties. Instead, the statute sets forth a litany of administrative rules and procedures comprising a comprehensive licensing scheme for the purpose of promoting private ownership of these facilities. We thus conclude that, based upon the plain language of the Licensing Act, there is no natural and logical connection between the privatization of these facilities and the subject of neighborhood safety. See *Williams*, 302 Ill. App. 3d at 979; *Dainty*, 299 Ill. App. 3d at 242.

Our conclusion is supported by a review of the legislative debates regarding Public Act 88—680. Representative Dart, who reported to the House on December 1, 1994, concerning the conference committee report, characterized the secured residential youth care facilities as

"an attempt on our part, to bring some of the Illinois children who we are shuffling off to other states, back to the State of Illinois. Its an attempt to at least put a dent into that. Right now we have over 700 children scattered throughout the United States who are our children, not their children. But we do not have the proper facilities or the laws which would allow them to be cared for in this state. Under this bill, we would now have that ability in a small way to at least begin bringing some of the children back into this state." 88th Ill. Gen. Assem., House Proceedings, December 1, 1994, at 70 (statements of Representative Dart).

Senator Collins echoed Representative Dart's statement that there was a need for secure residential youth care facilities in Illinois to remedy "the whole problem of having to place these children out of state." However, Senator Collins also voiced concern that the privatization of such facilities was "big business," and that there would be a "proliferation of these kinds of facilities and—and requests for licensing of these kinds of facilities from people in the business to make money." 88th Ill. Gen. As-

sem., Senate Proceedings, December 1, 1994, at 62-63 (statements of Senator Collins).

Additional concern was raised during the debates in regard to the Licensing Act's lack of rehabilitative programs for the juveniles housed in these facilities. Senator Jones inquired whether "there is anything in the bill that will ensure that *** some attempt would be made to rehabilitate [the children]." In response, Senator Dudycz stated that both DCFS and the Department of Corrections assured him that "those programs will be—made available to those juveniles." Senator Jones then commented that he expected that provisions for rehabilitative programs "would have been part of the bill." 88th Ill. Gen. Assem., Senate Proceedings, December 1, 1994, at 64-65 (statements of Senators Jones and Dudycz).

In sum, prior to the passage of Public Act 88—680, children too young to be placed in the Department of Corrections but too dangerous to be set free were already being sentenced to secure residential detention, although due to a lack of secure residential youth facilities in Illinois, these sentences were served out-of-state. Public Act 88—680 addressed this practice by establishing a comprehensive and detailed licensing act to allow private persons or entities to operate these types of facilities within our state. Contrary to the State's assertions, the plain language of the Licensing Act neither provides for rehabilitation of juvenile offenders nor implements increased juvenile penalties. We determine that these purely administrative licensing provisions are not germane to the subject of safe neighborhoods.

We believe that Public Act 88—680 is an example of "the very evil the single subject rule is intended to prevent." Wooters, 188 Ill. 2d at 519. We have previously observed that the framers of the Illinois Constitution included the single subject requirement to prevent the

" 'practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits,' " because such practice is " 'both corruptive of the legislator and dangerous to the State.' " *Fuehrmeyer*, 57 Ill. 2d at 202, quoting *People ex rel. Drake v. Mahaney*, 13 Mich. 481, 494-95 (1865).

We conclude that Public Act 88—680 illustrates this disfavored practice of "logrolling," wherein less popular legislation was bundled with more palatable bills, so that the well-received bills would carry the unpopular ones to passage. *Wooters*, 188 Ill. 2d at 518; *Johnson*, 176 Ill. 2d at 514-15; *Geja's Cafe*, 153 Ill. 2d at 257-58; *Fuehrmeyer*, 57 Ill. 2d at 201-02. The history and content of this legislation "confirm[s] that, with respect to [Public Act 88—680], the purposes of the single subject rule were not served." *Dainty*, 299 Ill. App. 3d at 243.

## CONCLUSION

For the foregoing reasons, we hold that Public Act 88—680 violates the single subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8). The judgment of the circuit court is affirmed.

*Affirmed.*

## DISSENTING OPINION UPON DENIAL OF REHEARING

JUSTICE McMORROW, dissenting:

On the basis of the severability argument raised in the *amicus* brief filed by Governor Ryan and on the basis of the severability argument raised in the *amicus* brief filed by the City of Chicago, I dissent from the Court's denial of rehearing. I express no opinion on the ultimate merits of the severability argument.