(No. 98932.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. VALDY OLENDER *et al.*, Appellees.

*Opinion filed December 15, 2005.*

124

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (Gary Feinerman, Solicitor General, and Linda D. Woloshin and Jay Paul Hoffmann, Assistant Attorneys General, of Chicago, of counsel), for the People.

John Benson, of Chicago, for appellee Valdy Olender.

Perry Grimaldi, of Chicago, for appellee Malgorzata Olender.

CHIEF JUSTICE THOMAS delivered the opinion of the court:

At issue in this case is whether the General Assembly violated the single subject clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 8(d)) when it enacted Public Act 88—669 (Pub. Act 88—669, eff. November 29, 1994). The legislation in Public Act 88—669, entitled "An Act in relation to government regulation," amended, among other statutes, section 1301 of the Illinois Income Tax Act (35 ILCS 5/1301 (West 1994)), to state that a first violation of that section is a Class 4 felony and each subsequent violation is a Class 3 felony. The defendants, Valdy and Malgorzata Olender, had been charged under the amended version of section 1301. Defendants moved to dismiss the indictments against them on the ground that section 1301 had been unconstitutionally amended by Public Act 88—669 in violation of the single subject clause. The circuit court of Cook County granted defendants' motions to dismiss. The State appealed directly to this court pursuant to Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)). For the following reasons, we affirm the judgment of the circuit court and hold that Public Act 88—669 violates the single subject clause.

## BACKGROUND

On March 25, 2002, defendants were charged by indictment with two counts of filing a fraudulent income tax return in violation of section 1301 (35 ILCS 5/1301 (West 2002)). Count I charged that defendants had willfully filed a fraudulent Illinois income tax return for the year 1998. The indictment alleged that defendants listed $0 on the line for adjusted gross income when they knew that their adjusted gross income for 1998 was in excess of that amount. Count II charged that defendants had willfully filed a fraudulent Illinois income tax return for the year 1999. Count II charged that defendants listed $0

on the line for adjusted gross income when they knew that their adjusted gross income for 1999 was in excess of that amount.

As noted, defendants filed motions to dismiss the indictments on the ground that Public Act 88—669, which amended the version of section 1301 at issue, was enacted in violation of the single subject clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, § 8(d)). Defendants argued that the provisions of Public Act 88—669 had no natural and logical connection to a single subject. Following argument, the circuit court, without stating the basis for its decision, entered an order granting defendants' motions to dismiss, discharging defendants, and releasing defendants from all conditions of their previous bonds.

## ANALYSIS

On appeal, the State first argues that the defendants lack standing to challenge the Act based upon the single subject clause given the nine-year delay between the passage of Public Act 88—669 (the Act) on November 29, 1994, and defendants' challenge to the Act in October 2003. In support of its argument, the State cites this court's decision in *Meister v. Carbaugh*, 310 Ill. 486 (1923), and the appellate court's decision in *Durjak v. Thompson*, 144 Ill. App. 3d 594 (1986).

In *Meister*, the plaintiff sought a declaration that " 'An act relating to civil service in park systems' " be declared unconstitutional and void and sought an injunction restraining the Civil Service Board of the South Park Commissioners from proceeding thereunder. *Meister*, 310 Ill. at 487. The plaintiff challenged the act on the ground that the act was passed in violation of section 13 of article IV of the Illinois Constitution of 1870 (Ill. Const. 1870, art. IV, § 13), which required that "the bill and all amendments thereto shall be printed before the vote is taken on its final passage." *Meister*, 310 Ill. at 487. The dispute

concerned section 11 of the Park Civil Service Act, which contained exemptions. *Meister*, 310 Ill. at 488. A Senate amendment to section 11 of the bill provided for exemptions including " 'All elective officers, the general superintendent, the attorneys, the chief of police and one confidential clerk or secretary.' " *Meister*, 310 Ill. at 488. A conference committee report recommended that the words "chief of police" be stricken from section 11. *Meister*, 310 Ill. at 487. However, the conference committee report was not printed in either house before the houses voted on the version of the bill that omitted the words "chief of police." *Meister*, 310 Ill. at 487.

In addressing the plaintiff's argument, this court noted that a material consideration of the two houses in enacting the law was the deletion of the words "chief of police." *Meister*, 310 Ill. at 488. Thus, if the constitutional objections were properly taken, this court could not hold section 11 constitutional, nor could section 11 of the act be held invalid and the remainder of the act sustained. *Meister*, 310 Ill. at 488. This court noted, however, that the act at issue had been passed by the General Assembly 12 years earlier and had been acted upon since that time. *Meister*, 310 Ill. at 488. In addition, the act had been amended by the General Assembly at a succeeding session and had constituted a part of the state's legislative policy for a number of years. *Meister*, 310 Ill. at 488. This court therefore concluded that the plaintiff lacked standing to contest the validity of the act. *Meister*, 310 Ill. at 489.

In so holding, this court noted that the constitutional provision at issue had been adopted to prevent surprise in the enactment of legislation. *Meister*, 310 Ill. at 489. Although there had been no prior decisions upon the constitutionality of the act, the act had gone into operation and had been applied for substantially 12 years without contest. *Meister*, 310 Ill. at 489. This court stated that:

"We do not lay down a principle that constitutional provisions of this character regarding legislative procedure must be availed of promptly, but we do regard it as improper for us to upset, on a basis such as this, a law long applied without constitutional question. We are of the opinion that under facts such as these, parties seeking to contest the validity of a law have lost by some eleven or twelve years' delay any standing that they might otherwise have in this court." *Meister*, 310 Ill. at 489.

In *Durjak*, the plaintiff sought to challenge the procedure under which the Income Tax Act had been enacted. *Durjak v. Thompson*, 144 Ill. App. 3d 594 (1986). As in *Meister*, the plaintiff claimed that the Income Tax Act had not been enacted in accordance with section 13 of article IV of the 1870 Illinois Constitution (Ill. Const. 1870, art. IV, § 13), which required that a bill be read at large on three different days in each house and that the bill and its amendments be printed before the vote on its final passage. *Durjak*, 144 Ill. App. 3d at 595. The circuit court denied plaintiff leave to file a complaint and the appellate court affirmed. *Durjak*, 144 Ill. App. 3d at 595.

The appellate court found that the *Meister* decision controlled. *Durjak*, 144 Ill. App. 3d at 596. The appellate court noted that the Illinois Income Tax Act had been enacted 16 years prior to plaintiff's challenge and had been repeatedly amended by the General Assembly since its original enactment. *Durjak*, 144 Ill. App. 3d at 596-97. As in *Meister*, the constitutional defect alleged was "simply that the bill and the amendments to it were not printed before the vote was taken on its final passage." *Durjak*, 144 Ill. App. 3d at 597. Moreover, the constitutionality of the Income Tax Act had been passed upon by the courts. *Durjak*, 144 Ill. App. 3d at 597. The appellate court therefore concluded that under the circumstances, the plaintiff lacked standing to maintain his constitutional challenge. *Durjak*, 144 Ill. App. 3d at 597.

The State argues that the instant case presents the same situation and concerns as those present in *Meister*

and *Durjak*. The State notes that Public Act 88—669 was enacted nine years prior to defendants' challenge to the Act. During that time, the provisions of the Act have been subsequently amended, and it is reasonable to presume that in the past nine years, the provisions of the Act had been relied upon by every branch of the Illinois government. The State argues that the constitutional challenge in this case is similar to the challenges in *Meister* and *Durjak*, because the challenge in this case is based upon the constitutional requirement for the passage of legislation rather than a substantive defect in the provisions of the statute. The single subject requirement is contained in the same subsection of the constitution as the printing requirement and is intended to ensure that legislation is not passed without adequate consideration by the legislature and to prevent passage of a bill containing unrelated subjects. The State maintains that *Meister* controls, so that the circuit court's order granting defendants' motions to dismiss must be reversed.

In response, defendants argue that the State has failed to consider this court's precedent concerning the standing of a defendant in a criminal case to challenge the constitutionality of a criminal statute. Defendants cite the principle that a court will not consider the validity of a statutory provision unless the person challenging the statutory provision is directly affected by it or the unconstitutional feature is so pervasive as to render the entire statute invalid. See, *e.g.*, *People v. Palkes*, 52 Ill. 2d 472, 480-81 (1972). Moreover, this court has recognized that a person has standing to challenge the validity of a statute if he has sustained or is in immediate danger of sustaining some direct injury as a result of the enforcement of the statute. *People v. Mayberry*, 63 Ill. 2d 1, 8 (1976). Defendants note that, under the current version of section 1301, they were charged with two Class 4 felonies. However, under the prior version of section

1301, a first violation of section 1301 was a Class A misdemeanor. Because Public Act 88—669 significantly increased the penalty for a violation of section 1301 from a misdemeanor to a felony, defendants contend that they clearly are within the class of persons directly affected by the unconstitutional enactment of Public Act 88—669. Further, because defendants are in immediate danger of sustaining some direct injury as a result of enforcement of the statute, they clearly have standing to challenge the validity of the statute, so that *Meister* does not apply.

We agree with defendants that *Meister* and *Durjak* are distinguishable from the instant case. The acts at issue in *Meister* and *Durjak* were civil, and the facts of those cases suggest that the challenges brought by the plaintiffs in those cases could have been brought at any time after the acts at issue were enacted. Given that fact, this court in *Meister* concluded that the plaintiff had "lost by some eleven or twelve years' delay any standing they might otherwise have in this court." *Meister*, 310 Ill. at 489. This court expressly stated that it was not holding that constitutional challenges to legislative procedure must be availed of promptly, but instead was holding that *under the circumstances of the case before it*, it would not allow the plaintiff to contest the validity of the statute at such a late date. *Meister*, 310 Ill. at 489.

Here, in contrast, defendants' challenge is to a criminal statute. Consequently, defendants did not have standing to challenge the statute until they were indicted and charged with violating the statute in March 2002. It is well settled that a party who challenges a statute as unconstitutional must bring himself within the class aggrieved by the alleged unconstitutionality. *Mayberry*, 63 Ill. 2d at 6. A party has standing to challenge the validity of a statute if he has sustained or is in immediate danger of sustaining some direct injury as a result of enforcement of the statute. *Mayberry*, 63 Ill. 2d at 8. Defendants

did not sustain, nor were they in immediate danger of sustaining, some direct injury as a result of enforcement of the statute at issue until they were indicted. See *Mayberry*, 63 Ill. 2d at 8 ("Once [defendant] was indicted, he was in immediate danger of being convicted of a Class 3 felony pursuant to the enforcement of the Cannabis Control Act"). This court has recognized that it is our duty to strike down legislation that violates the constitution, especially when the legislation at issue affects an individual's liberty or constitutional due process rights. *People v. Purcell*, 201 Ill. 2d 542, 546-47 (2002). For these reasons, we find this case to be distinguishable from our decision in *Meister*, and hold that defendants have standing to challenge the constitutionality of Public Act 88—669.

Having found that defendants have standing to challenge Public Act 88—669, we next consider whether Public Act 88—669 violated the single subject rule. A circuit court's holding that a statute is unconstitutional is reviewed *de novo*. *People v. Sypien*, 198 Ill. 2d 334, 338 (2001). The single subject clause of the Illinois Constitution of 1970 provides, in relevant part: "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, § 8(d).

The single subject rule regulates the process by which legislation is enacted. *People v. Cervantes*, 189 Ill. 2d 80, 83 (1999). As this court has stated:

> " 'The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the State.' " *Fuehrmeyer v. City of Chicago*,

57 Ill. 2d 193, 202 (1974), quoting *People ex rel. Drake v. Mahaney*, 13 Mich. 481, 494-95 (1865).

The single subject rule is designed to prevent the passage of legislation that, if standing alone, could not muster the necessary votes for enactment. *Sypien*, 198 Ill. 2d at 338. The practice of bundling less popular legislation with more palatable bills so that the well-received bills would carry the unpopular ones to passage is known as "logrolling." *Cervantes*, 189 Ill. 2d at 98. In addition to preventing logrolling, the single subject rule also facilitates the enactment of bills through an orderly and informed legislative process. *Cervantes*, 189 Ill. 2d at 83-84. By limiting a bill to a single subject, legislators can better understand and more intelligently debate the issues presented by a bill. *People v. Reedy*, 186 Ill. 2d 1, 14 (1999). The single subject clause thus promotes direct confrontation and informed discussion of legislative issues submitted for enactment. *Reedy*, 186 Ill. 2d at 14. In addition, "the single subject rule ensures that the legislature addresses the difficult decisions it faces directly and subject to public scrutiny, rather than passing unpopular measures on the backs of popular ones." *Johnson v. Edgar*, 176 Ill. 2d 499, 515 (1997).

In determining whether a violation of the single subject clause exists, the term "subject" generally is construed liberally in favor of the legislature. *Reedy*, 186 Ill. 2d at 8-9. Moreover, legislative acts are afforded a considerable presumption of constitutionality. *Reedy*, 186 Ill. 2d at 9. The presumption of constitutionality, however, is not without limits. *Reedy*, 186 Ill. 2d at 9. The subject of a bill may be as broad as the legislature chooses, as long as the bill's provisions have a natural and logical connection. *Reedy*, 186 Ill. 2d at 9. Accordingly, "the General Assembly violates the single subject rule when it includes within one bill unrelated provisions that by no fair interpretation have any legitimate relation to one another." *Reedy*, 186 Ill. 2d at 9.

With the foregoing provisions in mind, we must examine the procedural history and the substance of Public Act 88—669 in order to determine whether Public Act 88—669 violates the single subject rule. Public Act 88—669 began as Senate Bill 1369. Senate Bill 1369 was introduced on March 2, 1994. In its original form, Senate Bill 1369 amended three statutes. First, the Cannabis and Controlled Substances Tax Act was amended to allow State's Attorneys to request authorization from the Attorney General to enforce any tax or penalty under the Act and to provide that 30% of any tax or penalty collected in an action or proceeding brought by the State's Attorney would be remitted to the collecting county by the Department of Revenue (35 ILCS 520/14.1 (West 1994)). Second, Senate Bill 1369 amended the Criminal Code of 1961 to provide for the seizure and forfeiture of a vehicle, vessel, or aircraft used with the knowledge and consent of the owner in the commission of, or in the attempted commission of, stalking or aggravated stalking (720 ILCS 5/36—1 (West 1994)). Third, Senate Bill 1369 in its original form amended a Unified Code of Corrections provision concerning reimbursement by convicted persons to the Department of Corrections for expenses incurred due to the convicted person's incarceration (730 ILCS 5/3—7—6, 3—1—2, 3—12—5, 5—8—1 (West 1994)).

On March 25, 1994, the Senate added an amendment to Senate Bill 1369. Senate Amendment 1 further amended the Cannabis and Controlled Substances Tax Act to provide that a drug dealer who is guilty of violating the act is subject to a penalty two times the amount of the tax, in addition to the tax. 35 ILCS 520/10 (West 1994). Senate Amendment 1 also amended the Unified Code of Corrections to provide that an asset owned by a prisoner at the time of his transfer to a receiving facility designated by the Department of Corrections is subject

to provisions requiring inmates to reimburse the Department for the expenses of incarceration. 730 ILCS 5/3—7—6 (West 1994). In addition, the Unified Code of Corrections was amended to provide that the Attorney General could bring a claim against the estate of a dead prisoner within the time period for filing claims against the estate under the Probate Act. 730 ILCS 5/3—7—6 (West 1994). Finally, Senate Amendment 1 deleted an amendatory provision in the original version of Senate Bill 1369 concerning entry of judgments against individuals at the time of their sentencing for their incarceration costs. Senate Bill 1369 was passed by the Senate on April 13, 1994.

Senate Bill 1369 was introduced in the House of Representatives on April 14, 1994, as a bill for "an Act in relation to criminal law." Senate Bill 1369 experienced considerable growth in the House of Representatives through a series of eight amendments. The House passed Senate Bill 1369 with the amendments on July 12, 1994, and the bill was returned to the Senate for further approval. The Senate concurred in the amendments to Senate Bill 1369 and passed the bill on July 12, 1994.

After Senate Bill 1369 was passed by the House and the Senate, it was sent to then Governor Edgar for signature on July 21, 1994. At this point, Senate Bill 1369 was no longer titled "an Act in relation to criminal law," but instead had been renamed "An Act in relation to government regulation." On August 19, 1994, then Governor Edgar vetoed Senate Bill 1369.

Following Governor Edgar's veto, Senate Bill 1369 returned to the Senate, where a motion was made to pass the bill notwithstanding the veto. On November 16, 1994, the Senate voted to override the Governor's veto of Senate Bill 1369. Senate Bill 1369 next returned to the House of Representatives, where the House of Representatives also voted to override the Governor's veto. Public Act 88—669 became effective on November 29, 1994.

As enacted, Public Act 88—669 addresses a wide range of topics and is more than 100 pages long. In addition to the three statutes amended in the original version of Senate Bill 1369, Public Act 88—669 as enacted created two new statutes and amended provisions of 21 other statutes. For example, article I of the Act created the "Illinois Research Park Authority Act" (20 ILCS 3850/1—1 *et seq.* (West 1994)) and created the Illinois Research Park Authority. The Illinois Research Park Authority Act grants the Authority the power to support and develop university-related research parks and the authority to issue bonds. Article 5 of the Act created the "Geographic Information Council Act" (20 ILCS 1128/5—1 *et seq.* (West 1994)) and created the Illinois Geographic Information Council within the Department of Energy and National Resources. The Geographic Information Council was created to study issues relating to geographic information management technology.

Article 90 of the Act amended numerous statutory provisions. Section 90—1 amended the Casual Deficit Act (30 ILCS 340/0.01 *et seq.* (West 1992)) by renaming the act the "Short Term Borrowing Act" and authorized the Governor, Comptroller and Treasurer to borrow an amount not exceeding 5% of fiscal year appropriations for cash flow purposes and an amount not exceeding 15% upon failures in revenue. Section 90—1 also provided that cash-flow borrowing must be repaid in the fiscal year and that failures in revenue borrowing must be preceded by notice to the General Assembly and the Secretary of State and must be repaid within one year.

Section 90—1.1 amended the State Mandates Act (30 ILCS 805/8.18 (West 1994)) to provide that no reimbursement of local government is required for implementation of any mandates created by Public Act 88—669. Section 90—1.3 amended six provisions of the Illinois Income Tax Act, including the amendment at issue in this case,

which made a first violation of the Income Tax Act a Class 4 felony and a subsequent violation a Class 3 felony (35 ILCS 5/1301 (West 1994)). In addition, the Income Tax Code was amended to: (1) create a deduction for one year in an amount equal to the amount of income tax paid on grants received under the Nursing Home Grant Assistance Act (35 ILCS 5/203(a)(2)(U) (West 1994)); (2) redefine gross income in the case of a life insurance company (35 ILCS 5/203(b)(3) (West 1994)); (3) set forth the rule for determining whether an innocent spouse abatement will apply (35 ILCS 5/502(c)(4) (West 1994)); (4) provide that in the case of a taxpayer filing a return based on a substitute W—2 form provided by the Internal Revenue Service, it shall be presumed that the Illinois income tax was withheld in an appropriate amount if the substitute W—2 shows the appropriate amount was withheld from taxes for federal income tax purposes (35 ILCS 5/506.5 (West 1994)); and (5) provide that administrative decisions shall be made available for public inspection (35 ILCS 5/917(d) (West 1994)).

Section 90—1.7 and section 90—2.7 amended the Use Tax Act (35 ILCS 105/2, 9 (West 1994)) and the Retailers' Occupation Tax Act (35 ILCS 120/3 (West 1994)), respectively, to define watercraft as a Class 2, Class 3, or Class 4 watercraft, personal watercraft, or boats with inboard motors only, and to provide that if a period of demonstration use is more than one year for watercraft or aircraft, the retailer shall pay tax on the cost price. Section 90—1.7 also amended the Use Tax Act by removing the penalty due on a use tax return (35 ILCS 105/9 (West 1994)) and allowing inclusion of other reasonable information on a use tax return (35 ILCS 105/9 (West 1994)).

Section 90—2 amended the Service Use Tax Act by removing the penalty due on a service use tax return (35 ILCS 110/9 (West 1994)) and allowing the inclusion of

other reasonable information on a service use tax return (35 ILCS 110/9 (West 1994)). Section 90—2.3 amended the Service Occupation Tax Act by removing the penalty due on a service occupation tax return (35 ILCS 115/9 (West 1994)) and allowed inclusion of other reasonable information on a service occupation tax return (35 ILCS 115/9 (West 1994)). Section 90—2.7 amended the Retailers' Occupation Tax Act by setting forth rules for the public inspection of administrative decisions (35 ILCS 120/11 (West 1994)).

Section 90—3 amended the Cigarette Tax Act by setting rules for the public inspection of administrative decisions (35 ILCS 130/10b (West 1994)), and section 90—3.3 amended the Cigarette Use Tax Act to allow the sharing of tax information between the Department of Revenue and home rule units that have adopted a similar tax, and by setting forth rules for the public inspection of administrative decisions (35 ILCS 135/20 (West 1994)).

Section 90—3.5 amended the Property Tax Code to add the Senior Citizens Tax Freeze Homestead Exemption (35 ILCS 200/15—172 (West 1994)). Section 90—3.7 amended the Longtime Owner-Occupant Property Tax Relief Act to allow the corporate authorities of a county to establish additional criteria to qualify for a property tax deferral or exemption (35 ILCS 250/20 (West 1994)).

Section 90—4 amended the Motor Fuel Tax Law by making changes to the terminology used, by changing the requirements for display of a motor fuel tax license, by making it a Class A misdemeanor to fail or refuse to keep required books and records, and by making it a criminal offense to file a fraudulent application or order form (35 ILCS 505/1.16, 13a.3, 13a.4, 13a.5, 13a.6, 15, 16 (West 1994)). Sections 90—4.5 and 90—5 further amended the Cannabis and Controlled Substances Tax Act (35 ILCS 520/9, 10, 14.1, 15, 16, 19, 23 (West 1994)).

The following sections amended the enumerated

statutes by setting forth rules for the public inspection of administrative decisions: (1) section 90—5.5 amended the Messages Tax Act (35 ILCS 610/11 (West 1994)); (2) section 90—6 amended the Gas Revenue Tax Act (35 ILCS 615/11 (West 1994)); (3) section 90—6.5 amended the Public Utilities Revenue Act (35 ILCS 620/11 (West 1994)); and (4) section 90—7 amended the Telecommunications Excise Tax Act (35 ILCS 630/15 (West 1994)).

Section 90—7.5 amended the Downstate Forest Preserve District Act by exempting certain land from a provision of the Property Tax Code (70 ILCS 805/18.6d (West 1994)). Section 90—8 amended the Charitable Games Act by setting forth definitions (230 ILCS 30/2 (West 1994)), setting forth additional rules for an application for a license (230 ILCS 30/4, 5 (West 1994)), setting forth limitations on the number of game nights and game events (230 ILCS 30/4, 5, 5.1 (West 1994)), and setting forth other provisions on licensing and the conduct of charitable games and enforcement by the Department of Revenue (230 ILCS 30/6, 7, 8, 10, 11, 12 (West 1994)).

Section 90—8.5 amended the Liquor Control Act of 1934 by extending confidentiality provisions to financial information provided to certain home rule units (235 ILCS 5/8—9 (West 1994)). Section 90—9 amended the Communicable Disease Prevention Act by changing the amount of grants made from the Ryan White Pediatric and Adult AIDS Fund from a set percentage of funds to a competitive selection process, and by removing research as a purpose of grants (410 ILCS 315/2c (West 1994)).

Finally, section 90—9.5 amended the Illinois Vehicle Code by amending the offense related to failure to display a valid single trip permit (625 ILCS 5/11—1419.01 (West 1994)), the offense related to failure to display a valid motor fuel use tax license (625 ILCS 5/11—1419.02 (West

1994)) and adding an offense related to the failure to display valid external motor fuel use tax decals (625 ILCS 5/11—1419.03 (West 1994)).

Our review of the history and content of Public Act 88—669 establishes that, even construing the single subject requirement liberally in favor of the legislature, Public Act 88—669 was passed in violation of the single subject clause of the Illinois Constitution. As noted, the Act originally was entitled "An Act in relation to criminal law" and amended three statutes: the Cannabis and Controlled Substances Tax Act, the Criminal Code of 1961, and the Unified Code of Corrections. Following the addition of eight amendments in the House of Representatives, the Act became "An Act in relation to governmental regulation," and created two new statutes while amending numerous provisions in 24 other statutes.

The fact that the varied provisions in Public Act 88—669 might fit within the broad category of governmental regulation does not defeat defendants' single subject challenge. Indeed it is likely that any legislative action could fit within the broad category of governmental regulation. This court previously has cautioned that the use of such a sweeping and vague category to unite unrelated measures would render the single subject clause of our constitution meaningless. For example, in *Johnson v. Edgar*, 176 Ill. 2d 499, 517-18 (1997), this court rejected the argument that the discordant provisions of a public act entitled "An Act in relation to public safety" were related "because of a tortured connection to a vague notion of public safety." Likewise, this court in *People v. Reedy*, 186 Ill. 2d 1, 12 (1999), found a single subject violation in the enactment of a public act entitled "An Act in relation to governmental matters, amending named Acts." The *Reedy* court held that the act encompassed at least two unrelated subjects, observing "that these topics might fit within the broad subject of

'governmental matters' is not compelling." *Reedy*, 186 Ill. 2d at 12.

Perhaps recognizing that this court would reject such a sweeping category as "governmental regulation," the State notes that an act's title is not necessarily dispositive of its content. The State argues that although Public Act 88—669 is entitled "An Act in relation to governmental regulation," the Act actually involves the legitimate single subject of revenue to the state and its subdivisions.

The State is correct that this court has held that "an act's title is not necessarily dispositive of its content or its relationship to a single subject." *People v. Boclair*, 202 Ill. 2d 89, 109 (2002). Nonetheless, even looking beyond the title of Public Act 88—669 to the subject of revenue to the state and its subdivisions, we find that the Act violates the single subject clause of the Illinois Constitution. The State claims that each of the provisions of the Act are related to the single subject of revenue because most of the provisions relate directly to taxation. With regard to the remaining provisions, the State contends that those provisions involve raising revenue through licensing and forfeiture, provide for the creation and/or management of private or special funds, thereby reducing the state's burden and its revenue needs, or are designed to spur the Illinois economy and thereby create a greater revenue base.

We disagree with the State's characterization concerning the subject of revenue to the state and its subdivisions. The State's characterization of revenue to the state and its subdivisions is as broad as the subjects of governmental regulation, governmental matters and public safety. Indeed under the State's interpretation of revenue, almost any statute would have a natural and logical connection to the subject of revenue to the state as long as the statute had any tangential impact on the

state's economy. In contrast to the State's all-encompassing interpretation of revenue, Black's Law Dictionary defines "revenue" as "[g]ross income or receipts" and defines "general revenue" as "[t]he income stream from which a state or municipality pays its obligations unless a law calls for payment from a special fund." Black's Law Dictionary 1344 (8th ed. 2004).

In light of the preceding definition of revenue, it is clear that not all of the provisions of Public Act 88—669 have a natural and logical connection to the single subject of revenue to the state. For example, we discern no natural and logical connection between the subject of revenue to the state and its subdivisions and the creation of the Illinois Research Park Authority Act or the creation of the Illinois Geographic Information Council Act. That these acts might "spur the state's economy" does not establish a natural and logical connection to the subject of revenue.

Likewise, there is no natural and logical connection between revenue and the amendments to the Communicable Disease Prevention Act. As amended, the Communicable Disease Prevention Act provides:

> "§ 2c. Ryan White Pediatric and Adult AIDS Fund. From funds appropriated from the Ryan White Pediatric and Adult AIDS Fund, a special fund created in the State treasury, the Illinois Department of Public Health shall make grants to public and private agencies, by a competitive selection process, for patient care, counselling, and assistance for children and adults who are victims of acquired immunodeficiency syndrome (AIDS) or acquired immunodeficiency syndrome related complex (ARC)." 410 ILCS 315/2c (West 1994).

This amendment has no relation to "[g]ross income or receipts" or "[t]he income stream from which a state or municipality pays its obligations." The State argues, however, that this section relates to revenue to the state because the creation of a competitive selection process affects the grant amounts generated by a flat percentage

payout and because removing research as a grant purpose reduces the amount of funds paid to research groups, thereby increasing the monies available to the fund. We disagree. To sanction such a strained connection between this statute and the subject of revenue to the State and its subdivisions would render the single subject clause a nullity.

Our finding that Public Act 88—669 as enacted violates the single subject clause is supported by both the Governor's comments in vetoing Senate Bill 1369 and a review of the legislative debates regarding Senate Bill 1369. In vetoing the bill, then Governor Edgar stated:

"It would be good politics for me to sign this legislation, but I believe it would be bad public policy.

Senate Bill 1369 is a typical 'Christmas tree' bill. It was approved in the closing hours of the legislative session and includes numerous, wide-ranging and totally unrelated measures. Some of its provisions would have received my approval if they had reached my desk separately. Other provisions, however, are either technically flawed or not in the best interests of all the people of Illinois even though they have appeal to politically potent groups." 88th Ill. Gen. Assem., Senate Bill 1369, 1994 Sess., Governor's Veto, at 7532.

In discussing passing the bill despite the Governor's veto, Senator Rauschenberger made the following comments:

"I would like to rise and ask the Members of this Body to think carefully before they cast a vote on this bill. If we can be frank and honest—and if last Tuesday didn't tell us that that's what the voters want—if we can be frank and honest with ourselves and take a look at this bill, what we're—what we're about to do is vote on a short title, not on a good piece of legislation. There aren't a handfull [sic] of people in this Chamber who think this is good legislation, but we're afraid of the short title. If last Tuesday didn't tell us that—that the public wants change, that the public wants reform, that the public is tired of—of pork stuffed inside short-titled bills, then what message was last

Tuesday? Last Tuesday was the largest electoral turnover in the history of the United States, and the first action we take should not be to advance a flawed, omnibus bill which includes an industrial park financing in it that doesn't belong there. I urge a No vote." 88th Ill. Gen. Assem., Senate Proceedings, November 16, 1994, at 18 (statements of Senator Rauschenberger).

Senator Lauzen, in encouraging the other senators to vote for Senate Bill 1369, nonetheless stated that "it is regrettable that the bonding capacity has been added to this bill, because certainly those two things don't go together." 88th Ill. Gen. Assem., Senate Proceedings, November 16, 1994, at 20 (statements of Senator Lauzen).

The following exchange then took place in the House of Representatives:

"Representative Mulligan: Can you tell me how many Amendments are on this Bill that had nothing to do with the senior citizens [sic] property tax? Would it be fair to say a good number?" 88th Ill. Gen. Assem., House Proceedings, November 29, 1994, at 22 (statements of Representative Mulligan).

"Representative Schoenberg: There are ... there are seven or eight depending on how you interpret it. I think it's a fair characterization to say that this Bill is a [sic] omnibus Bill. It does incorporate a number of different areas, not just relating to property taxes, but other revenue related matters." 88th Ill. Gen. Assem., House Proceedings, November 29, 1994, at 22 (statements of Representative Schoenberg).

"Mulligan: An omnibus Bill because, obviously it's very difficult to vote against a tax break for senior citizens, so we're discussing the senior citizens, but we're not discussing really in depth a lot of the other issues that were tacked onto the Bill?" 88th Ill. Gen. Assem., House Proceedings, November 29, 1994, at 22 (statements of Representative Mulligan).

"Schoenberg: Well a number ... I don't think that that's necessarily a fair characterization. I think that if we look at the success ratio that existed within this past Session of

the Legislature, the ... those measures which passed, were those measures which were able to accommodate the various interests of people on both sides of the aisle. \*\*\* I view this, not like a christmas [*sic*] tree, beside the obvious reasons, but rather because, unfortunately, last time, the only way we could get things done sometimes, was to appeal to everyone's mutuality of interest in putting together a bipartisan omnibus package, and that's really what this Bill represents." 88th Ill. Gen. Assem., House Proceedings, November 29, 1994, at 22-23 (statements of Representative Schoenberg).

It is clear, then, that the Governor and certain legislators recognized that Public Act 88—669 was an example of the "disfavored practice of 'logrolling,' wherein less popular legislation was bundled with more palatable bills, so that the well-received bills would carry the unpopular ones to passage." *Cervantes*, 189 Ill. 2d at 98. The history and content of Public Act 88—669 confirms that the Act was passed in violation of the single subject clause of the Illinois Constitution. For that reason, we find that the circuit court did not err in granting defendants' motions to dismiss the indictments against them.

The State then argues in the alternative that even if certain provisions of Public Act 88—669 violate the single subject rule, this court should sever and declare invalid only those sections that are not related to the single subject of revenue to the state. The State acknowledges that in *Johnson v. Edgar*, 176 Ill. 2d 499 (1997), this court held that when an act is found to violate the single subject rule, the act must be struck in its entirety. The State argues, however, that *Johnson* considered the issue of severability with regard to a claim of mootness, and did not consider the issue of severability in the context of single subject violations. The State then notes that the Illinois Constitution of 1870 by its language required the severance of provisions passed in violation of its single subject requirement. The State concedes that the Illinois Constitution of 1970 removed the severability language

from the single subject provision, but argues that the elimination of the severability provision was not intended to preclude application of the severability principle to single subject violations.

There is no merit to the State's claim that the severability provision from the 1870 Constitution applies to the 1970 Constitution. Article IV, section 13, of the Constitution of 1870 provided that:

> "No act hereafter passed shall embrace more than one subject, and that shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed[.]" Ill. Const. 1870, art. IV, § 13.

In contrast, the single subject clause of the Constitution of 1970 provides that:

> "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, § 8(d).

Clearly, the 1970 Constitution removed the severability provision that existed in the 1870 Constitution. We therefore reject the State's invitation to construe the two provisions as if they were the same.

We also decline the State's invitation to reconsider our holding in *Johnson* that an act will be struck down in its entirety when the act violates the single subject rule. Initially, we note that the State is incorrect that this court in *Johnson* considered severability with regard to a claim of mootness rather than in the context of a single subject challenge. In fact, this court discussed severability with regard to single subject challenges in stating why defendants' claim of mootness did not apply in that case. *Johnson*, 176 Ill. 2d at 511-12. This court stated:

> "As we discuss in detail later in this opinion, the single subject rule prohibits the enactment of bills that encompass more than one subject. Thus, a challenge that an act violates the single subject rule is, by definition, directed at

the act *in its entirety*. There is no one provision or feature of the act that is challenged as unconstitutional, such that the defect could be remedied by a subsequent amendment which simply deleted or altered that provision or feature. In fact, a single subject challenge does not address the substantive constitutionality of the act's provisions at all. Rather, a single subject challenge goes to the very structure of the act, and the process by which it was enacted. If we determine that Public Act 89—428 in its structure is invalid, the Act may not be permitted to stand. The legislature is, of course, free to revisit the provisions contained in the Act in other legislation. Subsequent legislation, however, will not remedy the constitutional defect in Public Act 89—428 if it was passed in violation of the single subject rule." (Emphasis in original.) *Johnson*, 176 Ill. 2d at 511-12.

*Johnson*, thus, considered the issue of severability in the context of a single subject challenge. Our analysis in *Johnson* is equally applicable in this case. Allowing for severability with regard to single subject violations would be contrary to the purposes behind the single subject rule. This court previously has noted the "seriousness with which this court regards single subject clause violations." *Reedy*, 186 Ill. 2d at 13. We therefore decline the State's invitation to sever those provisions in Public Act 88—669 that violate the single subject clause.

For the foregoing reasons, we hold that defendants have standing to challenge the constitutionality of Public Act 88—669. We find that Public Act 88—669 violates the single subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8), and therefore hold that Public Act 88—669 is void in its entirety. The judgment of the circuit court of Cook County is affirmed.

*Circuit court judgment affirmed.*